SPRINT SPECTRUM L.P., d/b/a
SPRINT PCS, Plaintiff,

v.

TOWN OF NORTH STONINGTON, Town of North Stonington Planning & Zoning Commission, Arthur V. Pintauro, Chairman of Town of North Stonington Planning & Zoning Commission, and George C. Brown, Town of North Stonington Zoning Enforcement Officer, Defendants.

No. 3:97 CV 2679(GLG).

United States District Court,
D. Connecticut.

Aug. 31, 1998.

J. Daniel Sagarin, Elias A. Alexiades, Regina, Duchin, Kraus, Hurwitz & Sagarin, P.C., Milford, CT, for Plaintiff.

Earl F. Dewey, II, Suisman, Shapiro, Wool, Brennan, Gray & Greenberg, P.C., New London, CT, for Defendants.

## OPINION

GOETTEL, District Judge.

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Sprint Spectrum L.P., d/b/a Sprint PCS ("Sprint") moves for summary judgment. For the reasons discussed below, plaintiff's motion (Document # 18) is DENIED without prejudice.[1]

---

1. In a very conclusory fashion, defendants attempt to cross-move for summary judgment. First, they title their opposition brief "Memoran- dum in Opposition to Plaintiff's Summary Judgment Motions and in Support of Rule 56 Motion for Summary Judgment." Second, in the con-

## BACKGROUND

Sprint provides wireless personal communication services ("PCS") and has been licensed by the Federal Communications Commission ("FCC") to disseminate its services throughout Connecticut. The FCC license mandates that within ten years, Sprint must provide its services to a certain percentage of the Connecticut population. Accordingly, Sprint has embarked on a project to create a seamless web of cells. A cell represents the area within which a user is in contact with a PCS facility, also known as a cell site. Typically, a cell site consists of an antenna and equipment cabinets. As a user travels, the signal from the user's phone is passed from cell site-to-cell site. To provide continuous service, Sprint must have in place a system of interconnected cells resembling a honeycomb pattern.

Within the Town of North Stonington ("Town"), Sprint has attempted to establish cell sites that would provide coverage along Interstate 95 and Routes 2, 184, and 201. It has determined that multiple cell sites are required to achieve this purpose. Sprint already has a cell site on an existing 180–foot tower, owned by Wireless Solutions, the southeastern area of Town off of Boombridge Road ("Boombridge Road Site"). Sprint, however, needed additional cell sites to fill the gaps in service along Route 2 in the central and northwestern sections of Town.

Sprint first considered the Fire House located in the village of North Stonington. Sprint and the Fire Department began discussing a lease, but in January 1997 the Fire Department decided not to finalize the negotiations. Sprint then identified Pitcher Mountain as a potential cell site.[2] After determining that a 150–foot monopole would serve its coverage needs, Sprint entered into a lease with Milltown Properties, Inc. for a portion of a ten-acre lot off Reutemann Road, located within a subdivision known as Pitcher Mountain Estates ("Pitcher Mountain Site"). The proposed cell site is in an R–80 zoning district in which public utilities are permitted as of right, and communications towers require special permit approval. Zoning Regulations, Return of Record ("Record") Item 1, §§ 403.2, 403.4, at 4–1 & 4–2.

Consequently, on August 13, 1997, Sprint applied to defendant Town of North Stonington Planning & Zoning Commission ("Commission") for a special permit to construct a 150–foot communications tower and several PCS equipment cabinets at the Pitcher Mountain Site. Throughout the application process, Sprint submitted· a Propagation Study as depicted on a U.S. Geological Map with three overlays, showing the projected coverage from the Pitcher Mountain Site with no tower, a 100–foot tower, and a 150–foot tower (Record Item 19); a map of the Pitcher Mountain Zoning Plan, providing survey notes about the site (Record Item 20); a Proposed Public Utility Communications Facility Viewshed Analysis Map and Photo Location dated September 1997 (Record Item 21); and several studies describing the effect of radio and communications towers on property values (Record Items 17, 23, 24, and 25).

. The cell site would occupy a fifty-foot by fifty-foot section of the ten-acre lot. A Sprint representative described the proposed site as being "thickly wooded." Hearing Tr.

---

clusion to this opposition brief, defendants state "[a]ddditionally, it is requested that the Defendants' opposition to the Plaintiff's Motion for Summary Judgment be construed as a counter motion for summary judgment upon which it is requested that summary judgment be entered in favor of the Defendants." Defs.' Mem. at 39. Defendants, however, have not met the procedural requirements of moving for summary judgment because they did not file a Local Rule 9(c)1 Statement. While we could *sua sponte* grant summary judgment in defendants' favor, *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991), we find that a factual issue exists which precludes us from granting summary judgment in any of the parties' favor.

We also note that defendants' Local Rule 9(c)2 Statement is improper because it is non-responsive to the undisputed facts cited by plaintiff. In addition to raising its own set of disputed facts, a nonmoving party first must admit or deny the undisputed facts alleged by the moving party. This procedural requirement is more clearly set forth in the revised Local Rules (effective July 1, 1998).

**2.** Pitcher Mountain is a misnomer. It is actually· a wooded hill about 300 feet above sea level. Also, the evidence suggests that most of the nearby terrain is about 150 feet above sea level. *See* Return of Record ("Record") Item 25, at 4.

of 10/9/97, Record Item 34–a, at 7. The site plans provided that the 150–foot monopole and PCS equipment cabinets would be contained within a secured fenced area. Access to the site is gained by a dirt road which Sprint would widen to twelve feet and cover with gravel. Sprint would also run the necessary power and telephone lines underground. At the base of the monopole, Sprint would place the operational PCS equipment for the tower consisting of several refrigerator-sized cabinets. On top of the monopole, Sprint would place a triangle-shaped antennae rack capable of holding nine antennae panels (three panels per side). Each side has an array of one transmitting and two receiving antennae. The facility is designed to accommodate Sprint's antennas and antennas for two other carriers. Sprint intends to lease the additional space to other PCS providers, pursuant to an industry practice known as co-locating or co-sharing.

Shortly after Sprint submitted its application, the Commission adopted a moratorium on the installation of cellular and other wireless communications facilities for a period of nine months from the effective date or until March 31, 1998, whichever was later. The moratorium was effective upon its publication on September 9, 1997. Zoning Regulation Amendments, Record Item 1, at 1. The moratorium specifically prohibited cellular or other PCS providers from applying for special permits. It also prevented the Commission from approving any special permits. The moratorium's stated purpose was to "provide the Planning and Zoning Commission with sufficient time to study the issues involved in the placement, construction and/or modification of personal wireless service facilities, and possibly to amend the Zoning Regulations with regard to such issues as the siting, height, application and approval process for these facilities." *Id.* Since the moratorium's institution, the Commission adopted Zoning Regulations Amendments addressing wireless communications towers, antennas, and facilities. Defs.' Local Rule 9(c)2 Statement, Ex. F. Whether these new regulations should be applied retroactively is not an issue presently before us.

Despite the moratorium, the Commission continued to process Sprint's special permit application. The Commission first requested that Sprint conduct a balloon test to replicate the proposed monopole's height and the visual impact of the monopole. Record Item 35, at 2. Sprint ultimately held two separate balloon tests on September 15 and October 21, 1997 because not all Commission members were available to view the first test.

The Commission held two public hearings on October 9, 1997 and November 6, 1997. At a special meeting held on November 13, 1997, the Commission discussed the application but decided to consider it further. After this meeting, two Commission members requested an opinion from the Commission's attorney, Thomas Wilson, detailing the Commission's reasoning for its proposed decision ("Attorney Wilson's Letter"). Minutes of 12/4/97, Record Item 39, at 3. At the next special meeting on December 4, 1997, Chairman Pintauro read Attorney Wilson's Letter, dated December 4, 1997, into the record. After a brief discussion, the Commission voted unanimously to deny Sprint's application. All members stated on the record that Attorney Wilson's Letter represented their views. *Id.*

After the Commission denied its special permit application, Sprint commenced this action against the Town, the Commission, the Commission Chairman, Arthur Pintauro, and the Town's Zoning Enforcement Officer, George C. Brown. Among other things, Sprint claimed that the Commission's actions violated the Telecommunications Act of 1996 ("Act" or "Telecommunications Act"), 47 U.S.C. § 332(c)(7). Sprint now moves for summary judgment.

## DISCUSSION

A court may grant summary judgment only if it determines that there is no genuine issue of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). When ruling on

a summary judgment motion, a court must construe the facts in a light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Sprint asserts several claims under the Telecommunications Act. It argues that the Commission violated section 332(c)(7)(B)(iii) by failing to issue a written decision setting forth the reasons for denying the application, and by not supporting its decision with substantial evidence in the written record. It also contends that the Commission violated section 332(c)(7)(B)(i)(II) because the denial of its application and the institution of the moratorium prohibited or had the effect of prohibiting the provision of personal wireless services.

### I. Written Decision

■ One of the Act's procedural requirements is that a local zoning authority must issue its decision on a special permit application in writing. It must also explain the reasons for its decision and link these conclusions to evidence in the record. *Cellco Partnership v. Town Plan and Zoning Comm'n of Farmington*, 3 F.Supp.2d 178, 184 (D.Conn.1998); *Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford*, 995 F.Supp. 52, 56–57 (D.Conn.1998); *Virginia Metronet, Inc. v. Board of Supervisors of James City County*, 984 F.Supp. 966, 972 (E.D.Va.1998); *AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*, 979 F.Supp. 416, 428 (E.D.Va.1997); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 743 (C.D.Ill.1997); *Western PCS II Corp. v. Extraterritorial Zoning Auth. of Santa Fe*, 957 F.Supp. 1230, 1236 (D.N.M.1997). *But see Gearon & Co. v. Fulton County*, 5 F.Supp.2d 1351, 1354 (N.D.Ga.1998) (finding

that a rubber-stamp denial satisfied the Act's procedural requirements).

Defendants do not take issue with the requirement that a Commission detail the reasons for its decision. Rather, defendants dispute *where* in the record the Commission must provide the explanation. Defendants contend that it is enough for the Commission's reasoning to appear somewhere in the record, and not specifically in the notice informing a PCS applicant that its special permit was denied. Defendants therefore argue that they satisfied the procedural requirement because Attorney Wilson's Letter reviewed the reasons for the decision and the Commission adopted Attorney Wilson's Letter as its own.

While we agree that the Commission satisfied the written decision requirement, we severely disapprove of the approach it took. After the November 13, 1997 special meeting, two Commission members provided Attorney Wilson with their notes and essentially asked Attorney Wilson to prepare a shopping list of potential ways the Commission could deny Sprint's application. *See* Minutes of 12/4/97, Record Item 39, at 3.

We first note that the language of section 332(c)(7)(B)(iii) "clearly presupposes that the body that makes the decision shall be the one to render it in writing." *Virginia Metronet*, 984 F.Supp. at 972. As used in its plain meaning, "decision" means "(2)(a) an account or report of a conclusion, esp. of a legal adjudication or judicial determination of a question or cause." Webster's Third New International Dictionary 585 (3d ed.1966). Thus, the provision that "[a]ny decision by a State or local government or instrumentality thereof to deny a request ... shall be in writing" requires as a threshold matter that the zoning authority responsible for ruling on special permits will itself issue an account or report of its conclusions.

■ Second, while it was appropriate for the Commission to have sought legal advice, any such advice "could not be binding and any decision would have to be that of the Commission." *Phillips v. Town of Salem Planning & Zoning Commission*, No. 113120, 1998 WL 258332, at *5 (Conn.Super. May 12, 1998) (citing *Spero v. Zoning Bd. of*

*Appeals of Guilford,* 217 Conn. 435, 444–45, 586 A.2d 590, 594–95 (1991); *Blaker v. Planning & Zoning Commission of Fairfield,* 212 Conn. 471, 478, 562 A.2d 1093, 1096–97 (1989)). If the Commission intended to act on Attorney Wilson's advice, at the very least, the Commission should have indicated which parts of the letter it relied on in reaching its conclusion. Also, if the Commission agreed with the substance of Attorney Wilson's Letter, it should have further developed this proposed decision by linking the reasons to evidence in the record. Finally, instead of reading Attorney Wilson's Letter into the record, it should have issued a written decision emanating from itself which would have informed Sprint that its special permit had been denied and explained the reasons for the denial. Nevertheless, we find that the Commission satisfied the written decision requirement, but on very thin ice.

## II. Substantial Evidence in a Written Record

■ According to the substantial evidence standard, which is the traditional means of reviewing agency actions, this Court must determine whether the Commission's written decision is supported by " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *BellSouth Mobility Inc. v. Gwinnett County,* 944 F.Supp. 923, 928 (N.D.Ga.1996) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). A district court generally defers to a zoning board's decision and it cannot substitute its judgment for that of the board. *Farrington v. Zoning Bd. of Appeals of Noank Fire Dist.,* 177 Conn. 186, 190, 413 A.2d 817, 819 (1979). A court, however, "must overturn the board's decision under the substantial evidence test if it 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.' " *BellSouth,* 944 F.Supp. at 928 (citation omitted).

We now review the various reasons for the Commission's decision as stated in Attorney Wilson's Letter. At the outset, we note that part of the proposed cell site—the PCS equipment at the monopole's base—is permitted as of right because it is considered a public utility. Zoning Regulations, Record Item 1, § 403.2, at 4–1; *see id.* Appendix A, at A–11 (defining public utility). Only the monopole requires a special permit. *Id.* § 403.4, at 4–2. Thus, when applying the substantial evidence standard, we consider only whether the Commission's decision to deny a special permit for the monopole was supported by substantial evidence.

When reviewing a special permit application, the Commission must consider the criteria set forth in the Town's Zoning Regulations. Zoning Regulations, Record Item 1, § 702.1, at 7–1. Attorney Wilson identified four criteria that potentially apply to the proposed monopole at the Pitcher Mountain Site. Record Item 33. First, that "the structure will not be in harmony with the appropriate and orderly development of the zoning district in which it is proposed to be situated; and it will be detrimental to the area by reason of appearance." *Id.* at 1; *see* Zoning Regulations, Record Item 1, § 702.1(d), at 7–1. Second, that an adverse effect will result to: (a) the scenic and rural character of the district; (b) property values; and (c) historic features. *See* Zoning Regulations, Record Item 1, § 702.1(e), at 7–1. Third, that the proposed structure does not conform to all the requirements of the zoning district, specifically the height limits. *See id.* § 702.1(h), at 7–1. Fourth, that the proposed structure is inconsistent with the Town Plan of Development relating to antenna towers. *See id.* § 702.1(i), at 7–1.

### A. Harmony with an R–80 Zoning District

■ We find that both the use and structure of the monopole would be in harmony with the appropriate and orderly development of the R–80 zoning district surrounding Pitcher Mountain. According to the Zoning Regulations, an R–80 zoning district is a rural preservation district. It is described as follows:

This district extends throughout the northern three-fourths of the Town, and it includes most of the Town's reserved open

space and numerous scenic and rugged topographic features worthy of preservation in their natural state. It also contains most of the Town's agriculture. This area is particularly remote from municipal facilities and services and is very lightly developed at present. The major objectives of these Regulations are to maintain the low density of development in this area, encourage a continuation of agricultural activities, and preserve the appearance of remoteness and the rural character.

*Id.* § 304.3, at 3–2.

Sprint submitted evidence on the development plan for the area surrounding the proposed cell site. *See* Record Item 25, at 3–5. According to a study prepared by American Property Consultants ("APC"), the proposed monopole is located on a ten-acre parcel on Pitcher Mountain. The ten-acre lot is one of five lots forming Pitcher Mountain Estates, which is a 25–acre subdivision in the beginning stages of development. *Id.* at 4. The APC study concluded that the proposed tower is compatible with residential uses. *Id.* at 5.

Sprint also provided evidence that the proposed cell site would generate minimal noise and traffic. Record Item 16, at 13. Steve Carty, an engineer for SEA Consultants, testified that traffic would be minimal because the cell site would be serviced only once or twice per month. Hearing Tr. of 10/9/97, Record Item 34–a, at 10, 36. No other visitors are expected. Sprint also provided the Commission with an aeronautical study concluding that the monopole did not require any special marking or lighting pursuant to Federal Aviation Administration rules or regulations. Record Item 16, Ex. 6. Peter Gardell, a Radio Frequency Engineer with Sprint, testified that the FCC requires strobe lights only when a tower's height exceeds 200 feet. Hearing Tr. of 10/9/97, Record Item 34–a, at 33.

In contrast, Attorney Wilson's Letter does not specify how the proposed monopole would not be in harmony with the zoning district. After reviewing the record, we do not find that there was substantial evidence to support the Commission's conclusion on this issue. During the public hearings, Town residents expressed general concern about the compatibility of the cell site with the surrounding area. *See* Hearing Tr. of 11/6/97, Record Item 34–b, at 60–62, 67–68, 70–71. As an abutting landowner, the North Stonington Citizens Land Alliance Board of Directors prepared a statement in opposition to the proposed cell site expressing concerns about how the monopole would affect the Pitcher Mountain area. *Id.* at 62–66; *see* Record Item 32. However, "[c]onclusions by laypersons as to the effect from the granting of this special use permit, without supporting evidence or facts, is insufficient to support the denial of the special use permit." *Nagy v. Southington Planning and Zoning Comm'n,* Civ. No. 94–0464902S, 1995 WL 574048, at *5 (Conn.Super.Sept.13, 1995); *see Daughters of St. Paul, Inc. v. Zoning Bd. of Appeals of Trumbull,* 17 Conn.App. 53, 69, 549 A.2d 1076, 1084 (1988). Thus, we find that the Commission improperly relied on section 702.1(d) regarding harmony as a basis for denying Sprint's application. We address, *infra,* the portion of section 702.1(d) concerning whether the proposed tower will be "noxious, offensive, or detrimental to the area by reason of appearance."

### B. Property Values

Defendant argues that the proposed monopole will have an adverse effect on property values. *See* Zoning Regulations, Record Item 1, § 702.1(e), at 7–1. In support of its application, Sprint submitted an APC report concluding that the Pitcher Mountain Site would not negatively affect property values. Record Item 25. Sprint also submitted APC studies for New Haven and Fairfield Counties. Record Items 17, 23, and 24. Sprint submitted these other studies as general evidence that communications towers do not adversely affect property values. Moreover, the APC indicated that it was unable to conduct a study specific to North Stonington because there had not yet been enough home sales on which to prepare a meaningful value impact study. Record Item 25, at 2.

Defendants concede that a Commission cannot disregard the only evidence in the record on property values. *Sprint Spectrum L.P. v. Town of Farmington,* Civ. No. 3:97–

863, 1997 WL 631104 (D.Conn. Oct.6, 1997); *Fleischman v. Connecticut Bd. of Examiners in Podiatry*, 22 Conn.App. 193, 197, 576 A.2d 1308, 1311 (1990). Nevertheless, defendants contend that they did not need to credit the APC report and studies because they are "irrelevant." Defs.' Mem. at 18. Specifically, the Commission asserts that the APC report was conclusory and was not supported by comparables or statistics. *See* Attorney Wilson's Letter, Record Item 33, at 2.

Defendants, however, did not submit any study, report, or other evidence to contradict the APC's findings. Defendants spend considerable effort discrediting the APC studies to support their belief that none of the APC's conclusions, even those relating to North Stonington, are relevant. They then argue that because Sprint did not offer any relevant evidence on property values, the Commission had nothing to contradict.

■ We disagree. One issue before this Court is whether there is substantial evidence in the record to support the Commission's conclusion that the Pitcher Mountain monopole would negatively affect property values. If the Commission wanted to use this criterion as a basis for denying Sprint's application, the burden was on them at the administrative level to put some evidence in the record on property values. *See OPM–USA–Inc. v. Board of County Comm'rs of Brevard County*, 7 F.Supp.2d 1316, 1323 (M.D.Fla.1997) ("The Court finds that an unsupported and hypothetical 'potential' for a decrease in property values is insufficient to warrant denial of [plaintiff's] application."); *Nagy*, 1995 WL 574048, at *2–3 (concluding that a commission wrongly determined that a blasting service would adversely affect property values when the only evidence that property values would decrease consisted of speculations of protesting residents without any supporting expert testimony). Notably, defendants' counsel provides no citation to the record supporting his clients' position. In our review of the record, we found that the only evidence on this issue was the speculative concerns of Town residents. Hearing Tr. of 10/9/97, Record Item 34–a, at 41–42 & 62.

Because we find that the Commission improperly ignored the only evidence on property values and because there is no contrary evidence in the record other than mere speculation, we find that the Commission could not base its decision on special criteria section 702.1(e).

*C. Height of the Proposed Structure*

■ Next, the Commission argues that it could deny Sprint's application because the proposed monopole did not conform to all the requirements of the zoning district. Zoning Regulations, Record Item 1, § 702.1(h), at 7–1. In an R–80 zoning district, the height limit is forty feet. *Id.* § 503, at 5–3. While the proposed monopole is not a "building," it is a "structure." *See id.* Appendix A, at A–3 & A–14 (defining building and structure). The Commission's approval is needed for any structure exceeding forty feet.

Sprint argued that a 150–foot monopole was necessary due to Sprint's coverage needs, the hilly topography, and thickly-wooded vegetation. To demonstrate that a 150–foot monopole is the minimum height necessary, Sprint submitted a propagation study comparing the coverage provided by a 100–foot monopole and a 150–foot monopole. Record Item 19. The propagation study illustrates that a 150–foot monopole would contribute to a seamless web of coverage, but that a 100–foot monopole would cause about a one-mile gap in coverage. *Id.* At the public hearings, Gardell testified about the process Sprint used in determining where to place a cell site and what size monopole would be necessary at that site. *See* Hearing Tr. of 10/9/97, Record Item 34–a, at 16–19, 24–27 & 33; Hearing Tr. of 11/6/97, Record Item 34–b, at 3–9, 35, 43, 55 & 72–73.

The Commission found that because the proposed monopole's height exceeded the forty-foot height limit by 110 feet, the height of the proposed monopole was excessive. *See* Attorney Wilson's Letter, Record Item 33, at 2. The Commission also stated that the "applicant has not satisfied the commission that the proposed height is the minimum necessary to provide adequate service." *Id.* The Commission, however, submitted no evidence to contradict Sprint's conclusion that a

150–foot monopole was required at the Pitcher Mountain Site. This is unlike the facts in *Sprint Spectrum L.P. v. Willoth*, 996 F.Supp. 253 (W.D.N.Y.1998), where the town did provide evidence supporting the finding that a single, centrally-located, 250–foot tower could provide the same coverage needs as three towers. 996 F.Supp. at 258. Thus, on the one hand, Sprint submitted various forms of evidence to demonstrate why a 150–foot monopole would be necessary and why a lower height would not meet its coverage needs. On the other hand, the evidence in the record supporting the Commission's position consists of the Commission's subjective and conclusory finding that a 150–foot monopole is excessive tall, and the Commission's desire for a monopole to be the lowest height necessary to provide adequate service. There simply is not enough evidence in the record to support the Commission's finding on the proposed monopole's height.

### D. Visual Impact and Alternative Siting

█ Attorney Wilson cites to several provisions of the criteria for special permits that are all subsumed within the same issue—the visual impact of the proposed monopole. Thus, in this section we address issues involving the monopole's appearance (Zoning Regulations § 702.1(d)); the adverse effect to the scenic and rural character of the district and to the historic district (Zoning Regulations § 702.1(e)); and the consistency of the proposed monopole with the Town Plan of Development on Antenna Towers (Zoning Regulations § 702.1(j)).

Defendants contend that "[t]here was evidence of record to support a finding that the visual appearance would be detrimental." Defs.' Mem. at 10. Defendants, however, do not specifically reference any points in the record that support their position. Nevertheless, the potential adverse visual impact of the proposed monopole is the only reason offered by defendants that we find creates a genuine issue of material fact.

█ As part of the special permit criteria, the Commission was entitled to rely on the monopole's negative visual impact as a reason for denying Sprint's application. *See Whisper Wind Dev. Corp. v. Planning and*

*Zoning Comm'n of Middlefield*, 32 Conn. App. 515, 520–21, 630 A.2d 108, 110–11 (1993) (finding that a zoning commission may deny special permit applications on the basis of general considerations set forth in the town's zoning regulations), *aff'd*, 229 Conn. 176, 640 A.2d 100 (1994). This is not to say, however, that if there are no alternative sites for the placement of a PCS facility within a town, the visual concerns can predominate. Such a conclusion would be tantamount to entirely prohibiting the placement or construction of PCS facilities which would violate section 332(c)(7)(B)(i)(II) of the Act. Rather, a commission should particularly consider any adverse visual impact if there are alternative sites.

There was substantial evidence in the record to support the Commission's conclusion that the Pitcher Mountain Site would raise more significant visual concerns than a cell site at the Fire House. *See* Hearing Tr. of 10/9/97, Record Item 34–a, at 11–12 & 41–42; Hearing Tr. of 11/6/97, Record Item 34–b, at 17–19, 58–59, 61–62, 66 & 68–69. Representatives from Sprint testified that the Fire Department was their first choice for a site. Hearing Tr. of 11/6/97, Record Item 34–b, at 22–23. There was evidence that Sprint engaged in lease negotiations with the Fire Department. Hearing Tr. of 10/9/97, Record Item 34–a, at 34; Hearing Tr. of 11/6/97, Record Item 34–b, at 18–19 & 23. However, the *Town's* Fire Department terminated the lease discussions because of a perceived belief that its budget would be cut if it received lease money. Hearing Tr. of 10/9/97, Record Item 34–a, at 34; Hearing Tr. of 11/6/97, Record Item 34–b, at 23.

Defendants are now arguing that the Fire Department is a more appropriate site than the Pitcher Mountain Site. This is similar to a boy who shoots his parents and subsequently pleads for mercy because he is now an orphan. If, indeed, defendants would allow Sprint to place a 120–foot tower at the Fire House, a factual issue exists as to whether the Commission can solely base its denial on the visual concerns of the Pitcher Mountain Site. If the Fire House is still available and is satisfactory to both parties,

then no visual impact concerns would arise.[3] The record, however, is unclear as to whether the Fire House is still available as an alternative site. *See* Hearing Tr. of 11/6/97, Record Item 34–b, at 18, 23, 72–73. Additionally, there are factual issues as to whether this alternative site would adequately serve Sprint's coverage needs compared to the Pitcher Mountain Site.

### III. Prohibiting or Having the Effect of Prohibiting the Provision of Personal Wireless Services

Sprint asserts that the Commission violated section 332(c)(7)(B)(i)(II) when it denied the special permit application and when it instituted the moratorium.

#### A. Denial of the Special Permit

■■■ A zoning commission violates section 332(c)(7)(B)(i)(II) only if it has a general ban or policy that prohibits or has the effect of prohibiting the provision of personal wireless services. *Cellco*, 3 F.Supp.2d at 184–85. Plaintiff argues that the denial of the special permit prohibited or had the effect of prohibiting the provision of personal wireless services. Specifically, it contends that the Commission has a general bias against communications towers because they have a negative visual impact or because they are generally inconsistent with the Town Plan of Development.

The evidence, however, indicates that the Commission approved one of Sprint's special permit applications to modify an existing tower in the southeastern section of North Stonington on Boombridge Road. Pl.'s Local Rule 9(c)1 Statement ¶ 6, at 3. As previously mentioned, there was substantial evidence that the Town was amenable to locating a PCS facility at the Fire House. Also, the Plan of Development indicates that the Town does not want uncontrolled proliferation of communications towers. Record Item 3, at 92.

This evidence undermines Sprint's arguments because the Commission cannot have a general policy against permitting PCS facilities if it has approved special permits for these in the past. Moreover, there is no evidence to suggest that the Commission has changed course and has a general policy against allowing all PCS facilities in the future. The only conclusion that can be drawn from the Commission's handling of Sprint's application is that the Town has a preference for locating PCS facilities on existing structures rather than constructing new towers. This preference is evident in the new zoning regulations adopted by the Commission. Accordingly, we find that the Commission's denial did not prohibit or have the effect of prohibiting the provision of personal wireless services. *See Century Cellunet of Southern Michigan, Inc. v. City of Ferrysburg*, 993 F.Supp. 1072, 1077 (W.D.Mich.1997) (finding that a commission's decision did not violate section 332(c)(7)(B)(i)(II) because the City already had two PCS providers servicing the area; the plaintiff sought a special permit to improve service and not to provide service where none previously existed; and other alternative sites were available).

#### B. Moratorium

The Commission's moratorium became effective on September 9, 1997, which is approximately nineteen months after the Act's effective date. Zoning Regulation Amendments, Record Item 1, at 1. The moratorium prohibited PCS providers from submitting applications for special permits, and barred the Commission from approving these applications.

Generally, courts have found that the institution of moratoriums violates the Telecommunications Act. *Farmington*, 1997 WL 631104, at *5–6; *Sprint Spectrum L.P. v. Jefferson County*, 968 F.Supp. 1457, 1466–68 (N.D.Ala.1997). One exception was the passage of a six-month moratorium five days after the Act's effective date that prohibited the local commission only from issuing permits and not accepting applications. *Sprint*

---

**3.** We note that the Commission relied on the location of the Pitcher Mountain Site in a historic district as one reason for denying Sprint's application. It would behoove the Commission not to rely on this as a reason for denying a future application for a cell site at the Fire House because defendants are now pushing the Fire House as the most appropriate site.

*Spectrum L.P. v. City of Medina,* 924 F.Supp. 1036, 1037 (W.D.Wash.1996).

Under the circumstances before us, we find that we do not need to reach this issue because it is moot. *See Muhammad v. City of New York Dep't of Corrections,* 126 F.3d 119, 122–23 (2d Cir.1997) (stating that federal courts lack jurisdiction when parties do not have a legally cognizable interest in the outcome of a case). First, the moratorium expired by its terms on June 9, 1998, nine months after the moratorium's effective date. Before this time, on May 7, 1998, the Commission voted to terminate the moratorium and approve amendments to the Zoning Regulations. Second, despite the moratorium, the Commission processed Sprint's application by exchanging letters, requesting the balloon tests, holding two public hearings, seeking advice of counsel, and considering the application at two special meetings. It even issued a decision on Sprint's application during the moratorium's effective period. Consequently, we find that no live controversy remains over the moratorium. *See Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 514–15, 31 S.Ct. 279, 55 L.Ed. 310 (1911). For similar reasons, we further find that we do not need to decide whether the moratorium violated section 253 of the Telecommunications Act or whether the moratorium is preempted by federal law.

### CONCLUSION

For the foregoing reasons, plaintiff's summary judgment motion (**Document # 18**) is DENIED without prejudice. Plaintiff may renew this motion if a lease does not result with the Fire Department for the placement of a cell site there, or if the Commission denies its application for the placement of a cell site at the Fire House. The parties are directed to resolve these issues as soon as possible.

**SO ORDERED.**