244 F.3d 51 (1st Cir. 2001)
 SOUTHWESTERN BELL MOBILE SYSTEMS, INC., D/B/A CELLULAR ONE, Plaintiff, Appellant,
v.
LAURENCE M. TODD, AS HE IS A MEMBER OF AND CONSTITUTE THE BOARD OF APPEALS OF THE TOWN OF LEICESTER, WORCESTER COUNTY, MASSACHUSETTS;
VAUGHN N. HATHAWAY, AS HE IS A MEMBER OF AND CONSTITUTE THE BOARD OF APPEALS OF THE TOWN OF LEICESTER, WORCESTER COUNTY, MASSACHUSETTS; JAMES T. BUCKLEY, AS HE IS A MEMBER OF AND CONSTITUTE THE BOARD OF APPEALS OF THE TOWN OF LEICESTER, WORCESTER COUNTY, MASSACHUSETTS; LINDA G. FINAN, AS SHE IS A MEMBER OF AND CONSTITUTE THE BOARD OF APPEALS OF THE TOWN OF LEICESTER, WORCESTER COUNTY, MASSACHUSETTS; DENNIS E. HENNESSEY, AS HE IS A MEMBER OF AND CONSTITUTE THE BOARD OF APPEALS OF THE TOWN OF LEICESTER, WORCESTER COUNTY, MASSACHUSETTS, Defendants, Appellees.
 No. 00-1164
 United States Court of Appeals For the First Circuit
 Heard October 5, 2000
Decided March 30, 2001
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
 [Hon. Reginald C. Lindsay, U.S. District Judge][Copyrighted Material Omitted][Copyrighted Material Omitted]
 F. Alex Parra, with whom Louis N. Levine and D'Agostine, Levine, Parra & Netburn, P.C. were on brief, for appellant.
 Joseph C. Cove for appellees.
 Before Lipez, Circuit Judge, and Woodlock and Saris,* District Judges.
 LIPEZ, Circuit Judge.
 
 
 1
 On September 10, 1998, the Zoning Board of Appeals for the Town of Leicester, Massachusetts (the Board), voted unanimously to deny Southwestern Bell Mobile Systems, Inc.'s application for a special permit to construct a 150-foot high lattice telecommunications tower. Shortly after this denial, Southwestern Bell filed the present action in the district court, claiming, among other things, that the Board's decision was not supported by "substantial evidence contained in a written record," as required by the Telecommunications Act of 1996 (the TCA or the Act), and asking the district court to order the Board to issue the special permit. See 47 U.S.C. § 332(c)(7)(B)(iii). The district court disagreed and granted the defendants' motion for summary judgment. Southwestern Bell appeals from that judgment. Because we conclude that the record contains substantial evidentiary support for the Board's denial of the permit application, we affirm.
 
 I. Background
 
 2
 We briefly recite the facts as gleaned from the record before the Board, leaving a more extended recitation for our analysis of whether the Board's denial of Southwestern Bell's application was supported by substantial evidence. Section 5.4 of the Leicester Zoning Bylaws sets forth regulations applicable to wireless telecommunications facilities proposed within the Town. This Bylaw regulates such facilities in order to "minimiz[e] adverse impacts of wireless communication facilities upon adjacent properties, historic areas and residential neighborhoods, minimize the overall number and height of such facilities to only what is essential, to encourage co-location on a single structure, and avoid damage to adjacent properties from facility failure through engineering and careful siting of facilities." Under the Bylaw, wireless communication facilities may be allowed in numerous zoning districts, but only "upon the issuance of a special permit" by the Board. In April of 1998, Southwestern Bell filed an application for a special permit to allow it to construct a 150-foot tall telecommunications tower on a property offered to it by the Leicester Water Supply District approximately six months before Southwestern Bell filed its application. Southwestern Bell wished to use this tower to provide cellular coverage for the northern and central parts of Leicester, including Routes 9 and 56, the two major roads running through the Town.
 
 
 3
 The water district property is located on Route 56, which is named Paxton Street at that location, in a suburban-agricultural zone. Geographically, the site is at the approximate center of the town, atop a fifty-foot hill in an open field. The property already has two forty-foot high water towers. The surrounding locale is a low-density residential area, with high-tension electrical wires running through it approximately 1000 feet from the water district property. Two subdivisions in various states of completion are located in the immediate vicinity of the proposed tower. The closest, Carey Hill Estates, was relatively new at the time of the application, containing 57 units adjacent to the Water District property. At least some of the Carey Hill Estates homes would be no more than 200 to 300 feet away from the tower. The second subdivision, Leicester Woods, is slightly older and slightly farther away, with residences approximately 750 feet from the tower. It is also shielded somewhat from the water district property by a line of trees. Although the record is unclear about the precise stage of completion of these two developments, both pre-dated Southwestern Bell's application and both had rapid pre-sales of homes, indicating a relatively high degree of desirability. In addition, the tower was 360 feet from an elementary school, 700 feet from a high school, and 1350 feet from a middle school.
 
 
 4
 The facility that Southwestern Bell proposed consisted of the tower, an equipment shed, a propane tank for emergency operation, and a utility pole to bring electricity and telephone lines to the property. The entire structure would be surrounded by an eight-foot high fence, painted green, topped with three rows of barbed wire. In order to camouflage the shed and fence, ten-foot high plantings would ring the security fencing. The tower would be 350 feet from Paxton Street and 130 feet from the two water tanks. Because of the proximity of the site to the Worcester Airport, Southwestern Bell had applied for a permit from the Federal Aviation Administration. Though this permit had not been obtained at the time of the hearings, Southwestern Bell's consultant indicated that the FAA would likely require that the tower be painted in contrasting sections of red and white and be topped by at least one beacon to light the tower at night. The facility would run automatically with remote monitoring and would only require occasional maintenance visits.
 
 
 5
 Following its receipt of Southwestern Bell's application, the Board held a series of public meetings, during which it accepted Southwestern Bell's written materials and heard comment from the public and from Southwestern Bell's representatives and experts. Though the police, fire, and emergency medical services departments were all in favor of the tower, there was significant public opposition to its proposed location.[1] At the conclusion of the last meeting on September 8, 1998, a member of the Board moved to deny the application. After a brief discussion that revisited several concerns raised during the course of the hearings, the Board voted unanimously to deny the application. Two days later, the Board filed with the Town Clerk a written denial of the application. In this written decision, the Board listed three areas in which it had concluded that the application did not comply with the Bylaw:
 
 
 6
 It doesn't satisfy criteria of Minimum Visual Impact. Any tower that will be red and white with a beacon, that needs to be seen by a plan [sic] traveling over 100 mph, cannot have minimum visual impact, when there are no trees to hide it. Roads go 360 [degrees] around the site. The cirteria [sic] for granting a Special Permit cannot be satisfied. It would be an attractive nuisance being located next to schools. This does demonstrate that there is an adverse effect on property values.
 
 
 7
 This language mirrored the oral motion to deny from the last public hearing, albeit in a somewhat edited form as many of the facts offered orally in support of the three legal conclusions were not reproduced in the written denial. Indeed, the factual underpinnings of these conclusions, as reflected by the Board's discussion of the motion, were far broader than this paragraph indicates.
 
 
 8
 In response to this denial, Southwestern Bell filed the present complaint in the district court, naming the members of the Board as defendants and contending that the court should order the Board to issue the permit because the permit denial was not supported by "substantial evidence contained in a written record" as required under the TCA. Both sides moved for summary judgment. Following a hearing, the district court granted the defendants' motion and denied Southwestern Bell's, reasoning that while there was not sufficient evidence to support a conclusion that the tower would affect property values or be an attractive nuisance to schoolchildren, there was sufficient evidence to conclude that the tower would have more than a minimal visual impact. Southwestern Bell appeals from that judgment.
 
 II. The Telecommunications Act of 1996
 
 9
 Personal wireless services of the type at issue here are dependent upon "low-power, high-frequency radio signals" that are transmitted from "relay towers . . . and switching stations." Roberts v. Southwestern Bell Mobile Sys., Inc., 709 N.E.2d 798, 801 (Mass. 1999). In order "to provide consumers with mobile telephone service over a broad geographic area," that area is divided into cells, each transmitting and receiving signals on a specified frequency. Federal Communications Commission, Wireless Telecommunications Bureau, Fact Sheet #2, National Wireless Facilities Siting Policies at 27 (Sept. 17, 1996) (FCC Fact Sheet). Frequencies are assigned to multiple non-adjacent cells. See id. "When a cellular subscriber makes or receives a call, the call is connected to the nearest cell site. As a subscriber travels within a cellular provider's service area, the cellular telephone call in progress is transferred, or 'handed off,' from one cell site to another without noticeable interruption." Id.
 
 
 10
 Coverage within a cell is maintained by arranging antennae in a honeycomb grid. See Roberts, 709 N.E.2d at 801. Because the technology is low powered and operates only within line-of-sight of a tower, multiple towers are often required to ensure that any particular geographic area has sufficient coverage. When a coverage gap occurs, customers cannot "receiv[e] and send[] signals, and when customers pass through a coverage gap their calls are disconnected." Id. Furthermore, personal wireless service providers have an incentive to increase the number of cells and correspondingly decrease the geographic coverage of each cell because the "smaller and more numerous a provider's cells are, the more often it can reuse frequencies and the more users it can accommodate." FCC Fact Sheet at 27.
 
 
 11
 A provider's need for more transmitters to offer adequate service to a particular area creates a conflict with the desire of many communities to limit the proliferation of these facilities within their borders. The topography and existing developments in any given community often exacerbate this tension. See Roberts, 709 N.E.2d at 801. For line-of-sight technologies to work, they must be tall enough to be above sources of interference, which often means that they must be on hills or otherwise located in prominent locations. See id. Local radio transmitters can create interference for cellular signals, while the proximity of a location to airports can place absolute restrictions upon the height of any tower.[2] Moreover, as Congress found, "siting and zoning decisions by non-federal units of government[] have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit the deployment of Personal Communications Services as well as the rebuilding of a digital technology-based cellular telecommunications network." Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township, 181 F.3d 403, 407 (3d Cir. 1999) (quoting H.R. Rep. 104-204, at 94 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61). Even seemingly innocuous regulations, such as a requirement that towers be located on sites large enough to prevent damage to adjacent properties, can cause significant problems for wireless service providers, particularly if the municipality is primarily subdivided into smaller lots.
 
 
 12
 Enacted against this backdrop, the TCA reflects Congress's intent to expand wireless services and increase competition among those providers. See Sprint Spectrum L.P. v. Town of Easton, 982 F. Supp. 47, 49 (D. Mass. 1997). Congress sought to accomplish this goal by reducing the regulation and bureaucracy that stood in the way of a steady and rapid expansion of personal wireless services. See Nextel Communications of the Mid-Atlantic, Inc. v. Manchester-by-the-Sea, 115 F. Supp. 2d 65, 67 (D. Mass. 2000). In addition to facilitating the quick resolution of any disputes with localities, the TCA also provides protections from irrational or substanceless decisions by local authorities. See Roberts, 709 N.E.2d at 806. Nonetheless, though Congress sought to encourage the expansion of personal wireless services, the TCA does not federalize telecommunications land use law. See id. at 802. Instead, Congress struck a balance between localities and personal wireless service providers. SeeNextel, 115 F. Supp. 2d at 67. Under the TCA, local governments retain control "over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). Nonetheless, this control is now subject to several substantive and procedural limitations that "subject [local governments] to an outer limit" upon their ability to regulate personal wireless services land use issues. Town of Amherst v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 15 (1st Cir. 1999); see also 47 U.S.C. § 332(c)(7)(B).
 
 
 13
 Thus, in regulating "the placement, construction, and modification of personal wireless service facilities," local authorities may not "unreasonably discriminate among providers of functionally equivalent services; [or] . . . prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). They must act upon "any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time." Id. § 332(c)(7)(B)(ii). If they choose to deny an application, that denial must "be in writing and supported by substantial evidence contained in a written record." Id. § 332(c)(7)(B)(iii). The denial, however, may not be based on "the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." Id. § 332(c)(7)(B)(iv). Finally, "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof" may "commence an action in any court of competent jurisdiction." Id. § 332(c)(7)(B)(v).
 
 
 14
 As a result of these provisions, the TCA expands the scope of review by federal courts of local zoning decisions beyond the traditional deferential review which "limit[ed] the scope of inquiry to the constitutionality of the zoning decision under a standard of rational review." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 493 (2d Cir. 1999). Indeed, in some cases, where there is an allegation that a local authority "has discriminated among carriers or created a general ban" on personal wireless services, a federal court may undertake an extensive review of the local authority's decision because the anti-discrimination and anti-prohibition provisions of the TCA "involve[] federal limitations on state authority, presenting issues that the district court would resolve de novo and for which outside evidence may be essential." Town of Amherst, 173 F.3d at 16 n.7.
 
 
 15
 Southwestern Bell makes a passing reference in its brief to the mandate in the TCA against the prohibition of personal wireless services. See 47 U.S.C. § 332(c)(7)(B)(i)(II). We have held that a single denial of an application can run afoul of the TCA if that denial is "shown to reflect, or represent, an effective prohibition on personal wireless service." Town of Amherst, 173 F.3d at 14. Butsee AT&T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 428 (4th Cir. 1998) (holding that the "prohibits" clause applies to general blanket bans on services and not to individual zoning decisions). Nonetheless, Southwestern Bell does not seriously pursue an argument in its brief that the denial of its application was "an effective prohibition," and it specifically abandoned such a contention at oral argument.
 
 
 16
 Southwestern Bell does contend that the Board's written denial is unsupported by substantial evidence in the record. See 47 U.S.C. § 332(c)(7)(B)(iii). "Substantial evidence" review under the TCA does not create a substantive federal limitation upon local land use regulatory power, but is instead "centrally directed to those rulings that the Board is expected to make under state law and local ordinance in deciding on variances, special exceptions and the like." Town of Amherst, 173 F.3d at 16; Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 72 (3d Cir. 1999). The "substantial evidence" standard of review is the same as that traditionally applicable to a review of an administrative agency's findings of fact. See Sprint Spectrum L.P. v. Town of North Stonington, 12 F. Supp. 2d 247, 252 (D. Conn. 1998). Judicial review under this standard, "even at the summary judgment stage, is narrow." Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). We review the written record
 
 
 17
 considered as a whole. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The reviewing court must take into account contradictory evidence in the record. But the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.
 
 
 18
 Penobscot Air Servs., Ltd. v. Fed. Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999) (citations omitted). This review, though highly deferential, "is not a rubber stamp." Id. at 718 n.2. An agency, and by extension the Board, "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." Id. at 718 (quoting Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 378 (1998)). When the record "clearly precludes the . . . decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both," that decision must be set aside. Id. (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 490 (1951)). In reviewing the record on appeal, "we [also] apply the same legal standards that pertain in the district court and afford no special deference to that court's decision." Associated Fisheries of Maine, Inc., 127 F.3d at 109; see also Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 674 (1st Cir. 1998).
 
 III. The Written Decision
 
 19
 Before examining the evidentiary support for the Board's decision, we must first determine whether the scope of our review is limited by the first requirement in section 332(c)(7)(B)(iii) that denials of permits be in writing. Southwestern Bell contends that this requirement mandates that the Board make written findings of fact and conclusions of law, and that a review of the record under the TCA is limited to only those facts the Board specifically cited in support of its conclusion that the application failed to meet the criteria of the Bylaw. We disagree.
 
 
 20
 Courts evaluating what constitutes a proper written denial under the Act have been unable to settle upon a uniform standard to guide local authorities. See APT Pittsburgh Ltd. Partnership v. Penn Township Butler County of Pennsylvania, 196 F.3d 469, 474 n.4 (3d Cir. 1999) (noting lack of uniformity on the issue). Some courts have required that local authorities issue formal findings of fact and conclusions of law. See Smart SMR of New York, Inc. v. The Zoning Commission of the Town of Stratford, 995 F. Supp. 52, 56 (D. Conn. 1998) (citing AT&T Wireless Servs. of Florida, Inc. v. Orange County, 982 F. Supp. 856, 859 (M.D. Fla. 1997)); Illinois RSA No. 3, Inc. v. County of Peoria, 963 F. Supp. 732, 743 (C.D. Ill. 1997). Others have found that the writing requirement is satisfied by the written record of the meeting in which the application was denied and by the word "DENIED" and date of decision stamped upon a letter describing the application. See AT&T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 429 (4th Cir. 1998); AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 312-13 (4th Cir. 1999) (holding word "denied" written on first page of application sufficient). Both of these approaches seem flawed.
 
 
 21
 The requirement of formal findings of fact and conclusions of law has no basis in the language of the Act. Section 332(c)(7)(B)(iii) merely requires a written decision, in contrast to the Administrative Procedures Act and other sections of the TCA that explicitly require formal findings of fact and conclusions of law. See City Council of Virginia Beach, 155 F.3d at 429-30 (citing statutes). Furthermore, strong policy reasons counsel against reading congressional silence on this matter as permission to impose such a requirement. Passage of the TCA did not alter the reality that the local boards that administer the zoning laws are primarily staffed by laypeople. Though their decisions are now subject to review under the TCA, it is not realistic to expect highly detailed findings of fact and conclusions of law. In the absence of an express congressional directive, therefore, we find no basis for inflating "[t]he simple requirement of a 'decision . . . in writing' . . . into a requirement of a 'statement of . . . findings and conclusions, and the reasons or basis thereof.'" Id. at 430.
 
 
 22
 On the other hand, permitting local boards to issue written denials that give no reasons for a decision would frustrate meaningful judicial review, even where the written record may offer some guidance as to the board's rationale. A written record can create difficulties in determining the rationale behind a board's decision, particularly when that record reflects arguments put forth by individual members rather than a statement of the reasons that commanded the support of a majority of the board. See, e.g., Town of North Stonington, 12 F. Supp. 2d at 252. Even where the record reflects unmistakably the Board's reasons for denying a permit, allowing the written record to serve as the writing would contradict the language of the Act. See, e.g., Orange County, 982 F. Supp. at 859. The TCA distinguishes between a written denial and a written record, thus indicating that the record cannot be a substitute for a separate denial. See 47 U.S.C. §a332(c)(7)(B)(iii).
 
 
 23
 We conclude, therefore, that the TCA requires local boards to issue a written denial separate from the written record. That written denial must contain a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons. See Town of North Stonington, 12 F. Supp. 2d at 252. We stress, however, that a meaningful review of the decision is not limited, as Southwestern Bell would have it, only to the facts specifically offered in the written decision. Again, such a requirement would place an unjustified premium on the ability of a lay board to write a decision.
 
 
 24
 Here, shortly after the Board concluded its deliberations and voted to deny the permit, it issued a short written decision. The decision offers little explanation and few facts. Yet the Board states the reasons for its decision with sufficient clarity to permit an assessment of the evidence in the record supporting its reasons. We turn now to that task.
 
 IV. Substantial Evidence Review
 
 25
 Though the Board listed three reasons for its written denial of Southwestern Bell's permit application, the district court only found substantial evidentiary support for the Board's conclusion that the tower would have more than a minimal visual impact.[3] According to the Bylaw,
 
 
 26
 [t]he applicant shall successfully demonstrate to the satisfaction of the Board that the proposed facility will have minimal visual impact and constructed so it is reasonably capable of accommodating other users including other wireless communication companies and local police, fire and ambulance companies unless it is determined to be technically infeasible based on the Board's evaluation of information submitted.
 
 
 27
 (emphasis added). Southwestern Bell raises two objections to the Board's visual impact conclusion, arguing that there was no competent evidence in the record to support it, and that the Board could not deny the permit based upon the visual impact of the tower when there was no evidence of "available alternative sites with a lesser visual impact." We deal with each of these arguments in turn.
 
 
 28
 A. The aesthetic judgment.
 
 
 29
 According to Southwestern Bell, the only evidence in the record about visual impact reflects "generalized concerns" about aesthetics. Southwestern Bell argues that expressions of distaste for the aesthetics of a tower cannot support a finding that the applicant failed to demonstrate that the tower had a minimal visual impact. Instead, it says, there must be a quantifiable examination of the issue demonstrating, for example, the economic impact associated with the tower's appearance. We disagree.
 
 
 30
 The five limitations upon local authority in the TCA do not state or imply that the TCA prevents municipalities from exercising their traditional prerogative to restrict and control development based upon aesthetic considerations, so long as those judgments do not mask, for example, a de facto prohibition of personal wireless services. See Aegerter v. City of Delafield, 174 F.3d 886, 891 (7th Cir. 1999) (holding that the TCA does not prohibit local authorities "from applying general and nondiscriminatory standards derived from their zoning codes"); Nextel, 115 F. Supp. 2d at 67. In assessing the visual impact of the proposed tower, the Board was entitled to make an aesthetic judgment about whether that impact was minimal, without justifying that judgment by reference to an economic or other quantifiable impact.
 
 
 31
 Nonetheless, that aesthetic judgment must be grounded in the specifics of the case. Few people would argue that telecommunication towers are aesthetically pleasing. Some of the disapproving comments in the cases about generalized aesthetic concerns refer to negative comments that are applicable to any tower, regardless of location. See Oyster Bay, 166 F.3d at 495 (resident comments suggested misunderstanding of "what the proposed cell sites would actually look like," where residents objected to "a mass of spaghetti wires" and suggested that "antennae would project from the top of the water tank like 'a small birthday cake with candles'"). In other cases, the aesthetic objections were demonstrably without substance because of evidence that the towers and transmitters were either difficult to see or were aesthetically compatible with the character of the area. See Pine Grove Township, 181 F.3d at 406 (noting that 114-foot tower was surrounded by 80 to 90-foot tall trees and would only be visible to neighbors 600 feet away); Oyster Bay, 166 F.3d at 495 (noting that transmitters were located on catwalk of water towers and painted the same color as the background, thus preventing most residents from seeing them); Nextel, 115 F. Supp. 2d at 72 (describing evidence indicating that tower was designed to blend with the masts of vessels in area).
 
 
 32
 Although some of the evidence before the Board did consist of general statements that the tower was an eyesore, these statements did not dominate the debate. The majority of the objections to the visual impact of the tower specifically addressed whether this 150-foot tower was appropriate for this particular location, on the top of a fifty-foot hill in the middle of a cleared field. The location has no trees, was in the geographic center of town, would be visible at all seasons of the year, and would be seen daily by approximately 25% of the Town's population. It was also located in close proximity to three schools and two residential subdivisions. The closest of these two subdivisions, the Carey Hill Estates, had houses that were located only 200 feet away. Indeed, this subdivision was in such close proximity to the tower that Southwestern Bell used Carey Hill Estates construction plans as a reference map when drawing up the proposed plans for the tower. Purchasers who had placed deposits on houses that were to be built in this subdivision indicated that the tower would be plainly visible from their land. One of those purchasers had placed his deposit unaware that a tower was proposed in such close proximity. Concerned about this situation, two members of the Board visited other towers that had been described as comparable by Southwestern Bell's real estate appraiser.[4] The members concluded that these towers were not in a location as exposed as Southwestern Bell's tower and the houses were not as close. The School Committee, though voicing no formal opposition, was "concerned about the aesthetics of placing a cell tower with its associated dishes and arrays in proximity to school buildings." Several witnesses, pointing to the Bylaw's requirement that the "tower shall be of monopole or similarly unimposing design," argued that the lattice design of the tower was not an "unimposing design."
 
 
 33
 In response, Southwestern Bell argued that a lattice tower would be less visually intrusive than a monopole because it was a see-through rather than a solid structure.[5] Southwestern Bell also pointed to the ten-foot high plantings that it would place around the base of the equipment compound, thereby effectively hiding the equipment shed, propane tank, and fencing from view. These plantings, it argued, combined with the forty-foot high water towers on the Water District property and the high tension electric wires that cross in the vicinity of the tower, supported its argument that the tower would be compatible with the general character of the area. Nonetheless, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Penobscot Air Servs., 164 F.3d at 718 (quoting American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 523 (1981)). Nothing about the water towers and high tension wires "clearly precludes the . . . decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Id. (quoting Universal Camera, 340 U.S. at 490). The water towers were only forty feet tall and the electric wires were over 1000 feet away from the tower location. Southwestern Bell's tower would soar to almost four times the height of the water towers. Indeed, the evidence supports a conclusion that the proposed tower was of a different magnitude than anything else in the vicinity. When combined with the other evidence demonstrating that the tower was out of keeping with the residential uses in close proximity to it, we conclude that reasonable minds would find adequate evidentiary support for the denial of Southwestern Bell's permit application.
 
 
 34
 Finally, we note that the Board also based its minimal visual impact conclusion upon the fact that the tower would be painted in alternating red and white sections and would have a night beacon. The tower would only have these features because the FAA requires them. Though the Leicester Wireless Bylaw prohibits bright coloration and night lighting, it allows deviations from that prohibition when required by the FAA. To the extent that the Board's objection was based upon the failure to paint the tower a neutral color, the Board improperly relied upon this evidence to justify its decision. Because we conclude that there was substantial evidence to support the denial without the inclusion of this factor, it does not affect the outcome of this case.
 
 
 35
 B. Alternative sites.
 
 
 36
 Southwestern Bell argues that even if the evidence showed a more than minimal visual impact, that evidence could not support a denial unless there was evidence of alternative sites that would have a lesser visual impact. According to Southwestern Bell, the Board had the burden to provide substantial evidence to show the availability of these alternative sites and thus support the denial of the permit. In the absence of such proof, Southwestern Bell contends that we must reverse the district court and order the Board to issue the permit.
 
 
 37
 We see nothing in the TCA that would support placing a burden upon the Board to present evidence that there were other sites available to Southwestern Bell with a lesser minimal visual impact. The "substantial evidence" requirement does nothing more than allow applicants to overturn denials if they can prove that the denial lacks adequate evidentiary support in the record. Although that substantial evidence requirement is complemented by the provision in the TCA that prevents a locality from prohibiting personal wireless services, see Town of Amherst, 173 F.3d at 16, the burden would be on Southwestern Bell, and not the Board, to provide evidence demonstrating that "further reasonable efforts [to secure a special permit to build a wireless facility] are so likely to be fruitless that it is a waste of time even to try." Id. at 14. As Southwestern Bell conceded at oral argument, the record does not permit such a conclusion.
 
 
 38
 We note that under the Bylaw, each application for a special permit must be accompanied by both "[a]n evaluation of the feasibility of attaching the proposed facility to existing buildings or utilizing existing facilities for the proposed facility," and a "Site Justification Statement including a description of the narrowing process that eliminated other potential sites." Leicester, MA., Zoning By-laws § 5.4. Southwestern Bell complied with the first requirement, but it did not undertake to eliminate any other potential sites until prompted by the Board. At that point, Southwestern Bell only considered the two sites not involving preexisting structures that the Board had suggested.[6]
 
 
 39
 For a telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers. Such a showing may be sufficient to support an allegation that the zoning board's permit denial effectively prohibits personal wireless services in the area. Southwestern Bell understandably concedes that it has not demonstrated that the denial here constituted such a prohibition. We conclude, therefore, that the district court properly granted summary judgment to the Town.
 
 
 40
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Of the District of Massachusetts, sitting by designation.
 
 
 [1]
 One of the conditions the Leicester Planning Board imposed upon Southwestern Bell as part of its site plan review was that "Town of Leicester public safety communication systems will be allowed access to co-locate on this wireless communication tower if they deem necessary." Town public safety officials took the position that co-location on this tower would significantly improve coverage for their communication systems.
 
 
 [2]
 Both of these problems exist in Leicester, which has an AM radio transmitter within its borders and is near to both the Worcester and Spencer Airports. Southwestern Bell indicated during the public hearings on its application that these problems placed effective limitations upon its flexibility in siting its proposed tower.
 
 
 [3]
 Because we conclude that the district court correctly evaluated the evidentiary support for the minimal visual impact requirement, we do not express any opinion as to its conclusion that there was not substantial support for the Board's other reasons for denying the application. Moreover, in defending the district court's decision, the Town focuses its argument solely on the issue of the tower's visual impact.
 
 
 [4]
 These towers were mentioned in a report given to the Board that concluded, based in part upon a comparative analysis with homes in the vicinity of these other towers, that Southwestern Bell's facility would have no effect on property values.
 
 
 [5]
 According to Southwestern Bell, the requirement that towers accommodate other users mandates a larger tower and also limits the desirability of a monopole, which is less flexible than lattice towers for co-location. Nonetheless, the Board could properly consider the height and lattice structure in making its aesthetic judgment. Moreover, to the extent that the minimal visual impact and co-location requirements conflicted, the Board had the discretion to "modify any provision of the forgoing standards and conditions when in the Zoning Board's discretion . . . the strict adherence to the standards and conditions impedes the legitimate purposes of this Bylaw." We see no reason to interfere with the refusal to exercise that discretion absent some allegation that this failure to act violated the TCA by, for example, effectively prohibiting service.
 
 
 [6]
 The topic of alternate sites for this tower arose at the first public hearing on Southwestern Bell's application. The Board and members of the public were concerned that the tower was not an appropriate use of the Water District property because of its proximity to the schools and the two subdivisions. Suggestions were made about two other properties that were less developed and that consequently did not raise the same concerns. Southwestern Bell investigated these properties but did not choose to develop them because it concluded that neither would completely eliminate the gap in coverage along Routes 9 and 56.