VOICESTREAM MINNEAPOLIS,
INC., Plaintiff,

v.

ST. CROIX COUNTY, a Wisconsin Political Subdivision, and the St. Croix County Board of Adjustment, Defendants.

No. 01–C–0504–C.

United States District Court,
W.D. Wisconsin.

June 17, 2002.

Gary A. Van Cleve, Minneapolis, MN, for plaintiffs.

Mark J. Steichen, Boardman, Suhr, Curry & Field, Madison, WI, for St. Croix County

Joel L. Aberg, Weld, Riley, Prenn & Ricci, S.C., Eua Claire, WI, for St. Croix County Board of Adjust.

## OPINION AND ORDER

CRABB, Chief Judge.

Plaintiff VoiceStream Minneapolis, formerly known as APT Minneapolis, Inc., is a provider of personal communication services that wants to build a 185–foot tower in the town of Somerset, 1/4 to 1/2 mile outside the Lower St. Croix National Scenic Riverway. The town of Somerset approved the site for the proposed tower, but the St. Croix County Board of Adjustment denied plaintiff's application for a special exception permit on September 19, 2001.

Following the board's denial of the special exception permit, plaintiff brought this action seeking injunctive relief under the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, codified in 47 U.S.C. § 332, and compensatory damages under 42 U.S.C. § 1983. The Telecommunications Act provides for a "pro-competitive, deregulatory national policy framework" intending to deregulate communications companies in the interests of increasing competition and accelerating private sector deployment of advanced telecommunication and information services. The act provides for judicial review of local zoning decisions relating to telecommunications facilities. *See* H.R.Conf. Rep. No. 104–458, at 113 (1996), reprinted in U.S.C.C.A.N. 124.

Before the court are the parties' cross motions for summary judgment. Plaintiff contends that the board's decision to deny the special exception permit is not supported by substantial evidence in the record as required by § 332(c)(7)(B)(iii) of the Telecommunications Act and that the denial has the effect of prohibiting the provision of personal wireless services in violation of § 332(c)(7)(B)(i)(II). (In its complaint, plaintiff also contends that the board's decision unreasonably discriminates against providers of functionally equivalent services in violation of § 332(c)(7)(B)(i)(I). However, plaintiff has not adduced any evidence to support this claim and has not addressed it in its briefs. I consider that plaintiff has waived it. *See Muhich v. Commissioner*, 238 F.3d 860, 864 n. 10 (7th Cir.2001).)

After a review of the written record of the proceedings before the board, I conclude that summary judgment must be granted in favor of defendants. Substantial evidence in the record supports the board's determination that plaintiff's proposed tower would have an adverse visual impact on the Lower St. Croix National Scenic Riverway and that plaintiff had not met its burden to produce evidence showing the infeasibility of other, less visually-intrusive alternatives for closing its coverage gap. Further, plaintiff has failed to meet its burden of showing that the board effectively banned personal wireless services when it denied plaintiff's special permit application.

From the parties' proposed findings of fact and the record of the proceedings before the board, I find that the following material facts are not disputed for the purpose of the motions for summary judgment. (Some of these facts are drawn from the affidavit of Michael O'Rourke. Because I am relying on facts supported by the O'Rourke affidavit for background purposes only, I find it unnecessary to rule on defendants' objection to the affidavit on the ground that it does not satisfy the personal knowledge requirement.)

## UNDISPUTED FACTS

### I. *BACKGROUND*

Plaintiff VoiceStream Minneapolis, Inc., formerly known as APT Minneapolis, Inc.,

is a Delaware corporation engaged in the business of providing personal communication services. Defendant St. Croix County is a political subdivision of the state of Wisconsin. The St. Croix County Board of Adjustment is a subdivision of St. Croix County, organized and existing pursuant to Wis.Stat. § 59.64.

The provision of personal communication services requires the construction and placement of antennas that are capable of receiving and transmitting wireless communication signals in accordance with radio frequency standards. The location of these antennas is determined by radio frequency engineering that takes into account factors such as population demands, topographical constraints of the land, the height of the antenna and the proximity to and the height of other antennas. To operate properly in the personal communications system the antenna must be elevated to allow a relatively unimpeded line of sight to end users' telecommunications equipment, although a strong signal can go through woods and buildings. Antennas are often placed on existing host structures, such as an existing water or fire tower. If a suitable host structure is not available, a communications tower must be constructed to elevate the antenna.

Plaintiff began seeking a site for a communications facility that would allow it to fill a gap in its personal communications service coverage along Wisconsin Highway 35, Minnesota Highway 95 and the St. Croix River corridor. After conducting a radio wave computer simulation and examining the relevant zoning maps for the region, plaintiff determined that the best site for a communications tower was on property in the town of Somerset owned by William and Opal Haase.

The Haase property is located approximately 1/4 to 1/2 mile east of the federally-protected Lower St. Croix National Scenic Riverway in an area zoned "Agricultural" under the St. Croix County zoning code. The Lower St. Croix was designated a scenic river in 1972 under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 – 1287, which strives to protect selected free-flowing rivers that "with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." 16 U.S.C. § 1271. The National Park Service owns and manages the riverway, which includes the St. Croix River and approximately 1/4 mile of land on either side in Minnesota and Wisconsin. Simultaneously, St. Croix County has exercised its zoning authority over that portion of the riverway that is within its boundaries and has created a zoning district bordering the river called the "Riverway District." (Although there are no maps in the record that show the exact relationship of the park service and Riverway District boundaries, it appears that the land controlled by the National Park Service consists of a smaller area than that included in the county's Riverway District. *Compare* Rec. of Bd. of Adj. Hearing, July 26, 2001, attached to Aff. of Debra Zimmerman, dkt. # 20, exh. 7C, *with* dkt. # 20, exh. 7V.) Across the river from the Haase property is the Minnesota city of Marine on St. Croix. The central part of Marine on St. Croix is a historic district listed on the National Historic Register. When conducting its search for a telecommunications site, plaintiff excluded the Marine on St. Croix Historic District, Scenic River Border and Riverway Zoning District because of zoning laws prohibiting the construction of telecommunications towers in these areas.

On February 9, 2000, plaintiff entered into a site agreement with the Haases under which the Haases permitted plaintiff to use their property for the purpose of installing, removing, replacing, maintaining, altering and operating a communica-

tions facility. As a condition precedent to the site agreement, plaintiff was required to obtain all necessary permits from local and federal land use jurisdictions. On April 5, 2000, the Somerset town board approved plaintiff's application for a special exception permit allowing it to build a 185–foot monopole communications tower on the Haase property. The town board indicated in its decision that plaintiff would also have to obtain approval from St. Croix County.

## II.  *THE ST. CROIX COUNTY ORDINANCE*

Pursuant to Section 17.70(7) of the St. Croix County ordinances, a person seeking to construct a wireless communication facility in St. Croix County must follow a specific application process, the purpose of which is to:

(1) Accommodate the communication needs of residents and businesses while protecting the public health, safety and general welfare;

(2) Facilitate the provision of wireless communication services to residents and businesses of St. Croix County;

(3) Minimize adverse visual effects of wireless communication facilities through careful siting and design standards;

(4) Avoid potential damage to adjacent properties from the construction and operation of wireless communication facilities through structural standards and setback requirements; and

(5) Maximize the use of existing and approved towers, buildings or structures to accommodate new wireless communication antennas to reduce the number of towers needed to serve the community.

Wireless communication facilities are regulated according to the zoning district in which they are proposed to be located. Within districts designated as Agricultural, new towers are permitted only with a special exception permit issued under section 17.70 of the general county zoning ordinance. Ord. § 17.85(2)(b)2. Within Shoreland, Floodplain and St. Croix Riverway Districts, antennas are permitted with a special exception permit if they are attached to an existing tower or structure and do not extend more than 20 feet above the highest point of the tower or structure. Ord. § 17.85(4)(a)1. No other towers or antennas are permitted in these districts. Ord. § 17.85(4)(b). The ordinance defines an "antenna" as "[a]ny device or equipment used for the transmission or reception of electromagnetic waves ..." and a "tower" as "[a]ny structure that is designed and constructed primarily for the purpose of supporting one or more antennas ...". Ord. §§ 17.81(1), 17.81(7).

Applications for special exceptions are determined by the board. No special exception permit may be granted for uses that would be contrary to the general welfare of the community or the spirit and intent of the general zoning ordinance. Ord. § 17.70(7)(a). If warranted, the board may require the applicant to furnish additional relevant information before it passes on an application for a special exception permit. Ord. § 17.70(7)(e)1.

## III.  *SEPTEMBER 28, 2000 HEARING BEFORE THE BOARD OF ADJUSTMENT*

On March 23, 2000, plaintiff applied to the St. Croix County Board of Adjustment for a special exception permit for the construction and operation of the tower at the Somerset site. The board scheduled a public hearing on plaintiff's permit application on September 28, 2000. Before the hearing, plaintiff met with representatives from the National Park Service, the city of Marine on St. Croix and other parties to

address concerns about the visibility of the tower and its effect on historical properties and the St. Croix River. As a result of this meeting, plaintiff performed crane simulation tests on June 27, 2000. A follow-up meeting to discuss the results of the crane tests was held on August 10, 2000.

Before the September 28, 2000, hearing, the city of Marine on St. Croix submitted a resolution in which it opposed the siting of the proposed tower, finding that the tower would be "visually obtrusive and aesthetically unappealing to both residents of the city and recreation users of the Federally Protected National Scenic St. Croix River" and that "multiple lower towers will provide adequate coverage." Twelve residents living near the site of the proposed tower submitted a petition opposing the tower on the Haase property, citing concerns about the tower's impact on the scenic view of the river and the agricultural land along its bluffs, dangers to birds and other wildlife and the possibility of other, less-intrusive alternatives.

At the hearing, the board heard testimony from individuals who testified both for and against the proposed tower. Greg Korstad, a lawyer for plaintiff, testified about the plans for the tower and explained that it was designed to fill a gap in coverage that existed for the St. Croix area. Korstad testified that the St. Croix River area presented a coverage challenge because of the river valley and the rolling terrain. According to Korstad, in order to provide coverage to the area, plaintiff had to construct either several low towers or one tall tower. He testified that one of the reasons plaintiff determined that a single tower on the Haase property was desirable was because it could be constructed at a height lower than 200 feet, which avoided any requirement for Federal Aviation Administration lighting or obstruction markings.

Korstad testified about plaintiff's meetings with the National Park Service, the city of Marine on St. Croix and other local agencies regarding their concerns about the aesthetics of the tower and its effect on historic properties and the St. Croix River. Korstad testified that as a result of the meetings, two sites were identified as alternatives to the Haase site: 1) a location farther to the east on the Haase property; and 2) a location farther east and north. Korstad testified that if plaintiff moved the proposed tower farther east to either of these sites, the height of the tower would have to be raised to 250 feet in order to maintain the same radio frequency coverage. In addition, additional antennas would have to be constructed. Korstad testified:

And here's where the difficulty comes in, that adding those additional antenna locations in the River Valley means that we have to put in a—we have to seek approval for the antennas that would be located either in the riverway district in St. Croix County or in the prohibited setback areas in Washington County. Under each of the zoning codes, that's not permitted, so we'd either have to come to you and ask to have you change your zoning code to allow a tower to be put in the riverway district, or we'd have to go to Washington County and ask them to allow a tower to be put in their protection—their setback protection district. We didn't think that was going to be feasible from a practical standpoint and—or a reasonable standpoint, so that's going to be, frankly, a problem that we're going to have trouble overcoming.

In any event, the conclusion that was reached from these alternative analyses was that, because the gaps in coverage required infrastructure that would be difficult to get approved, perhaps impossible to get approved, and because the

increased height of the towers would change the impact to the Town of Somerset and make it more difficult to get community acceptance in the Town of Somerset, the least intrusive alternative is really what is presented to you today . . .

Several members of the public, including the Haases, spoke in favor of plaintiff's special exemption permit application. The Haases submitted a petition in favor of the tower signed by approximately 125 people who lived or did business in the area near the proposed tower. Ed Schachtner, Chair of the Town of Somerset, testified that the town preferred the one 185–foot tower on the Haase property rather than a 250–foot lighted tower further east.

Paul Roelandt, a management assistant with the National Park Service, testified that the National Park Service was opposed to the construction of the proposed tower for aesthetic reasons. He testified that the scenery in the St. Croix River Valley was a valuable resource that demanded creative solutions, such as "stealth" technology in which towers were designed to look like trees or silos, in order to preserve the landscape. He testified that he and other park service representatives had observed during the crane testing that plaintiff's proposed tower would be visible from the river and the Marine on St. Croix Historic District on any of the three alternative sites that had been tested. Roelandt testified that plaintiff had developed the alternative sites on its own and that, with one exception, the park service had not had the opportunity to propose alternatives before the crane testing. As for alternatives, Roelandt testified that the National Park Service was ready and willing to work with the industry to try and determine where can we locate facilities. And we've even said at a couple of the meetings that if it turned out that the best way to provide coverage was in the riverway district, and we could to it in such a way that would be as unobtrusive as possible, we would probably entertain that possibility. You know, putting it on public land, perhaps providing the lease at a reduced cost to the company. I think we need to look at all of those options, but I don't have specific things for you today.

Tr. of Bd. of Adj.Mtg., Sept. 28, 2000, dkt. # 20, exh. 4, at 82–83.

Jack Warren, a resident of the City of Marine on St. Croix, testified against the tower. Warren submitted photographs that he took from various locations in the city of Marine on St. Croix during the crane testing that showed that the tower would be visible from the city. Warren testified that the city of Marine on St. Croix was willing to consider revising its ordinance to allow the construction of unobtrusive towers to help facilitate wireless coverage. Warren testified that "[p]art of the reasoning for that was a glimpse at [plaintiff's] coverage data which was presented at the August meeting which showed that there might be acceptable coverage assuming that towers could be placed in the so-called forbidden zone or forbidden areas of the search ring." *Id.*, at 82–83.

Jeff Nelson, a consultant hired by St. Croix County to review plaintiff's special exemption permit application and the underlying data, submitted a report in which he offered five opinions:

**Opinion # 1:** A "gap" in coverage exists under the present construction and arrangement of towers/facilities of the *APT/Voice stream* network in the northern end of the town of Somerset.

**Opinion # 2:** No suitable existing structures were identified which are located within the area needed to improve the coverage as identified above.

**Opinion # 3:** On the basis of our own observation we note that the proposed 185 monopole tower, if situated on the Haase property, will be visible from locations as far east as Hwy 95 in the vicinity of Marine on the St. Croix, Minnesota, and in selected areas north of "Marine". This is consistent with the NPS presentation at the August 10, 2000 meeting which stipulated that at certain locations the upper section of the crane was visible at water level of the river. It is our understanding that the St. Croix Riverway District includes these areas from which the tower will be visible if constructed.

**Opinion # 4:** Furnished drive test data as provided by *APT/Voice stream* is incomplete inasmuch as it does not depict the route driven and the data presented leads us to conclude that the same route was not driven for each test.

**Opinion # 5:** *APT/Voice stream* has an economic interest in limiting the number of towers to cover an area such as the one under review here. As a general statement, the carrier can achieve more coverage by raising their antennas (within certain constraints) to a level which provides the most commanding "view" or footprint within an area. In instances such as the one under consideration in this application, the antennas would be raised so high as to be visible from the vicinity of the St. Croix river. *APT/Voice stream* can build (and has built) sites with lower antenna elevations. Typically placement of antennas at lower antennas results in more sites needed to cover an area than if the antennas were placed higher. This has an economic impact (higher cost) for the carrier since more infrastructure is needed. It also results in the need for more complex review, by local authorities, since the proposed additional facilities may each require additional approval/construction time cycles. We note that § 17.80(3) of the St. Croix County Zoning Code lists, as one of its purposes to "Minimize the adverse visual effects of wireless communications facilities through careful siting and design standards." We further note that the Code has as a companion purpose the objective of "reduce(ing) the number of towers and structures needed to serve the County". It is our opinion that the *APT/Voice stream* monopole proposed for the Haase property is a "standard" design which does not attempt to minimize (conceal) the adverse visual effects to the St. Croix Riverway District or the adjacent historic preservation areas such as those found at Marine on the St. Croix. We further believe that via alternative placement and design efforts *APT/Voice stream* coverage objectives could be satisfied in a fashion which has a lower visual impact upon the St. Croix Riverway District.

Following the hearing, the board voted to table plaintiff's special exemption permit application and to require plaintiff to provide more information. Among the information requested was a detailed environmental assessment and proof that the site did not adversely affect any historical sites in Wisconsin or Minnesota. In addition, the board asked plaintiff to provide a "detailed plan that lessens the visual impact of this proposed tower to the adjacent area known as the 'Lower St. Croix National and Scenic Riverway' and to adjacent historical areas," including pictorial renderings of the proposal, which the board referred to as "stealth" concealment; and "information on alternative sites with explanations of why they do or do not work for their intended purpose." With respect to alternative sites, the board specifically requested "that a plan be prepared (with a narrative, map and mock-up) that shows more towers at lesser heights to lessen the visual impact on this national scenic area."

Finally, the board requested plaintiff to respond to the concerns raised by Nelson's report.

## IV. *PLAINTIFF'S RESPONSE TO BOARD'S REQUEST FOR ADDITIONAL INFORMATION*

On May 10, 2001, plaintiff submitted a letter to Zoning Director Steve Fisher in which it responded to the board's request for further information regarding its proposed telecommunications facility. Plaintiff's submissions included an environmental assessment prepared by Pinnacle Engineering, Inc. in which Pinnacle concluded that the tower on the Haase property did not present an adverse environmental impact. Also included were reports from the Wisconsin and Minnesota State Historic Protection Offices finding that the tower did not have an adverse effect on historic properties. With respect to the board's request that plaintiff submit a plan regarding "stealth" concealment, plaintiff indicated that its proposal for the tower on the Haase property already employed stealth technologies by using a monopole rather than a lattice design and coloring the tower a dull gray so it would be less conspicuous when viewed against the sky. Plaintiff stated that other stealth technologies such as installing antennas on tall buildings or designing the antenna to look like a tree were not feasible because there were no tall buildings in the area and the proposed site was in a cornfield.

As for the board's request that plaintiff explore whether coverage could be provided using shorter towers, plaintiff stated that any such plan would require towers in the riverway which were prohibited by the zoning codes of St. Croix and Washington County (on the Minnesota side of the river). It also indicated that because of the undulating terrain, shorter towers would necessitate "numerous additional antennas." Plaintiff did not submit any maps, mock-ups or pictorial renderings of any plan using more towers at shorter heights.

In response to the board's request that plaintiff provide an update of its discussions with the National Park · Service, plaintiff indicated that it had had "several formal and informal discussions with representatives of the National Park Service about the concerns raised by NPS staff about how the FCC licensed service would be delivered in both Washington and St. Croix Counties." Plaintiff stated that the National Park Service had suggested that there were other alternative locations for the tower, but did not identify those "other locations." Plaintiff indicated that it was "clear" from correspondence received from the park service relating to additional facilities proposed by plaintiff near the St. Croix River that

> the NPS is opposing any application within the vicinity of the riverway regardless whether they have authority to regulate or have acquired property rights. You will recall that the NPS representative testified at the board of Adjustment questioning the need for mobile telephone service improvements such as proposed by VoiceStream suggesting that a preferred alternative was a satellite communications service. Clearly this confirms that the Parks Service is in direct opposition to the project. Accordingly, it is not likely that further discussions with NPS would be meaningful.

Pinnacle Engineering addressed the topic of alternative sites in its environmental assessment report. The report stated:

> Two buffer zones have been established around the St. Croix River. These are the Scenic River Border and the Riverway Zoning District. Any construction or modifications within these areas require additional zoning approvals. The National Park Service controls most of

the land in these buffer zones. In addition, as part of the zoning district rules, construction of wireless towers is expressly prohibited. Justifying a variance for a tower would be nearly impossible if other viable locations are available . . .

The preferred site is one of only a very few locations that would meet the full coverage objectives with a single, unlit tower. Even if another location with a willing landowner could be found that would meet that original objective, with the limited area remaining in the search radius after the Marine on St. Croix Historic District, Scenic River Border and the Riverway Zoning District were removed from consideration, there would almost certainly be similar visual impacts.

There are, however, other ways of meeting the coverage objective . . . [one] alternative would be to construct a series of smaller towers to provide service to the target coverage area . . .

APT has determined that none of these options eliminate the potential for visual impacts, and in some cases, the visual impacts would actually increase. In addition, some of the options may not be practical or even possible due to land use restrictions, zoning setback requirements, and/or unwilling landowners.

Addressing the option of multiple towers at shorter heights, the Pinnacle report stated:

Another approach to meeting the coverage objective would be to install multiple shorter towers within the target coverage area. These would have to be adjacent to the highway to provide adequate coverage, and may not be feasible due to highway right-of-way and setback requirements. In order to meet the coverage objective with the shorter towers, at least one of the towers may need to be located in the Marine on St. Croix Historic District. In order to be usable, the towers would have to extend a minimum of 20 feet above the tree line. At least some of these would likely be visible from the Marine on St. Croix Historic District and/or the St. Croix River. There are almost no co-location opportunities since the towers would be designed to extend as little as possible above the tree line. Finally, some of the opponents of the preferred tower, who are expressing preference for this option, have already strongly opposed similar, shorter sites near the St. Croix River necessary to fill other gaps in APT's coverage. As a result, this option would likely not solve the problem but may only postpone it by being the first of many contested tower approval applications.

APT's materials also included a May 2, 2001, memo from Steve Ramberg, its senior radio frequency engineer. In the memo, Ramberg stated that he had evaluated several silos and other existing structures that Nelson had proposed that might be used as possible antennae sites. Ramberg concluded that none of the sites were feasible for various reasons. In particular, Ramberg concluded that even though some of the silos could be used to provide coverage to Highway 35, another antenna of at least 200 feet would be needed to see into the river valley. According to Ramberg, none of the silos were high enough to accommodate this second antenna.

Nelson, the county's tower consultant, prepared a supplemental report in response to the additional materials submitted by plaintiff. Nelson indicated that plaintiff had "appear[ed] to have made a business decision" to pursue a single, higher elevation site instead of multiple, lower elevation sites. Although Nelson labeled plaintiff's failure to pursue alternative designs "disappointing," he noted that there

was nonetheless a technical need for plaintiff's proposed tower and that its single-tower approach was consistent with the tower ordinance's goal of minimizing adverse effects and reducing the number of towers needed. Nelson stated:

> While we continue to believe that coverage footprint expansion to serve the unmet needs of the area may be achieved by using multiple, lower elevation sites there are expected to be a host of associated issues relating to conformance to regulations (i.e. zoning), leasing, and construction suitability which arise from building multiple sites vs. a single site. We also believe that the decision to require VoiceStream to build multiple sites in lieu of a single, taller site would need to be a discretionary (or negotiated) one undertaken by the County regulatory authorities.

Attached to Nelson's report was a copy of an e-mail dated June 20, 2001, addressed to Ramberg. Nelson wrote:

> Thanks for talking with me about the North Somerset application and your memorandum of May 25, 2001. As I related on the phone, when Greg Korstad, Steve Fisher (St. Croix County) and I met in the fall of 2000 to discuss the Haase property application, we also discussed alternatives which would be based upon multiple, "lower impact" sites. As I explained during our talk, the suggested sites given to Greg Korstad at that meeting contemplated that some combination of them would be used in aggregate rather than individually as a one-for-one substitution of the Haase application. If I understood our conversation this morning correctly, your May 25, 2001 review concludes that none of the sites individually (vs. in aggregate) would be an adequate substitute for the site proposed on the Haase property.

In the e-mail, Nelson asked Ramberg to provide additional information, including coordinates, ground elevation and height assumptions, that he relied upon to reach his conclusions about the infeasibility of the alternative sites.

In a memorandum dated June 25, 2001, and subsequently provided to the board, Ramberg responded to Nelson's report. Regarding the additional information that Nelson had requested via e-mail on June 20, 2001, Ramberg stated: "The additional information requested does not affect the conclusions about whether the site is needed for coverage. That additional information is found in the attached memo." (I have not been able to locate any "attached memo" in the record. Therefore, I presume that Ramberg was referring to his May 2, 2001, memo that plaintiff had attached to its initial response to the board's request for additional information.) According to Ramberg:

> We have as recommended by the County's consultant evaluated whether the service could be accomplished by increasing the number of sites using existing tall structures as antenna locations. We have concluded that it will not be [sic] meet coverage objectives in the riverway area. Because of this, no multiple site configuration is presented.

> From a technical design perspective we must also confess to some disappointment over the lack of sufficient engineering effort as related to the proposed alternatives. The site locations given us were not selected as a matter of technical feasibility, rather that of random selection based on a drive through the area. A significant amount of time and resources have been expended on behalf of an appropriately engineered site, including propagation, simulations, traffic pattern analysis and site evaluations.

## V. *JULY 26, 2001 HEARING BEFORE THE BOARD OF ADJUSTMENT*

On July 10, 2001, the board sent a letter to plaintiff informing it that a public hearing was scheduled for July 26, 2001. Before the meeting, the board received comments from the public, the St. Croix River Association, the Minnesota–Wisconsin Boundary Area Commission and the City of Marine on St. Croix objecting to plaintiff's special exemption permit application. Clarence Malick, executive director of the Minnesota–Wisconsin Boundary Area Commission, stated that he had met with a group of valley citizens and municipal representatives and that the group preferred shorter towers, "even though that meant there had to be more of them." The St. Croix River Association, a group representing 361 households, encouraged the board to require towers to have "stealth" designs that were consistent in height and appearance with existing unobtrusive features in the rural landscape in order to "preserve the views and the viewscapes which are historic, scenic and environmentally enhancing." Clarence Nelson, a private citizen, commented that the city of Marine on St. Croix's visible surroundings were part of what defined the historic setting of the community and that plaintiff's proposed tower would intrude upon that setting as well as upon the outstanding scenic resources of the St. Croix River Valley. The City of Marine on St. Croix reiterated its concern that plaintiff's proposed tower would have an adverse visual impact on the St. Croix River and surrounding valley, including the Historic District of Marine on St. Croix. The city also stated that plaintiff's response to the board's request for additional information was incomplete, in that it suggested that a "plan involving more towers at lesser heights has some level of technical feasibility," but that plaintiff had not provided any plans, maps or further analysis of this plan.

Zoning board staff prepared a summary outlining plaintiff's request and the completeness of its application. Staff concluded that plaintiff had not adequately responded to the board's request for additional information regarding alternative stealth designs and had not submitted alternative mock-up plans. Staff agreed with Nelson's opinion in his September 27, 2000 letter that plaintiff's proposal did not attempt to minimize the adverse visual effects to the riverway or to the adjacent historic preservation areas such as those found in Marine on the St. Croix. Staff indicated that the St. Croix Riverway and nearby historic preservation areas possessed extraordinary scenic qualities that demanded special consideration for proposed wireless telecommunication service facilities.

On July 26, 2001, the board held the second hearing on plaintiff's special exemption permit. Korstad testified again for plaintiff and explained that plaintiff's alternatives for constructing a lower tower were limited because of the county's ordinance prohibiting towers in the Riverway District. He stated that plaintiff had evaluated the sites proposed by Nelson as possible sites in the Riverway on which to attach one or more antennas, but had concluded that this option would not be feasible without also constructing another tower of the same height that it proposed to build on the Haase property. Korstad testified that in order for plaintiff to provide its coverage needs, it needed to construct a tower tall enough to see into the riverway, which meant in turn that it would be impossible to disguise the tower as a tree or other natural feature of the landscape.

Representatives from the National Park Service testified against the tower on the Haase site because of its visual impact. Jill Medland, a planning and compliance

specialist, testified that plaintiff had not adequately explored the alternative of shorter towers with stealth designs. Medland stated:

> And Mr. Korstad stated that that was impossible for them to do because they couldn't locate in the Riverway District. I would like to point out that they could locate within the boundary of the Riverway with permission from the National Park Service, and we have mentioned this to Mr. Korstad in the past, that we could issue a special use permit for locating a[sic] antenna facility within the Riverway if it did not impact the scenic values, and obviously we would be willing to entertain such a request if it would mean it wouldn't have the impacts of this 185–foot proposed tower.

Tr. of Bd. of Adj.Mtg., July 26, 2001, dkt. # 20, exh. 7, at 152.

When asked by a board member whether he was aware that plaintiff might be able to locate a tower within the riverway, Ramberg, plaintiff's radio frequency engineer, stated that he was not. The following exchange then took place:

> BOARD MEMBER GOLZ: Does it sound like a viable option to you having just heard it?

> MR. RAMBERG: No, not really. Because what we are trying to do is we're trying to cover a broad area with as minimal number of towers as we can. We are trying to cover Highway 95, we're trying to cover the riverboat traffic, which goes on some of the riverboat cruises that come up the river, we're trying to cover Highway 35. So suddenly you are trying to cover all these different areas, well, if we put a tower below near the river, there's no way I'm going to be able to get up over the hill

and cover Highway 35, so you know, I can't make that work.

*Id.,* at 172.

On July 27, 2001, the board reconvened to vote on plaintiff's application. In a three-two decision, the board denied plaintiff's application for a special exemption permit. On September 19, 2001, the board sent plaintiff a formal written decision. The board made the following findings of fact:

1. The applicants are APT Minneapolis, Inc. (now known as Voice stream) and William and Opal Haase. The address of the property is 324 230th Avenue, Somerset, Wisconsin 54025.

2. The applicants filed with the Zoning Office an application for a 185–foot telecommunications tower in the Agricultural District.

3. The Town of Somerset, on a 2–1 vote, recommended approval of the request.

4. The proposed monopole would be located just outside the St. Croix Riverway District.

5. The Board found that granting of the request would not be consistent with the spirit and intent of the Zoning Ordinance.

The Board made the following additional findings:

1. The 185–foot cell tower would be visible from the Lower St. Croix National Scenic Riverway.

2. The applicant has not adequately researched or brought forth information on an alternative site or multiple alternative sites to lessen the visual impact on the Lower St. Croix National Scenic Riverway.

3. The National Park Service (NPS) has provided testimony stating that they would work with the applicant

to explore and develop stealth sites within NPS riverway areas.

\*     \*     \*     \*     \*     \*

5. This tower and this location had tremendous public and agency opposition.

6. Of any area in St. Croix County, the Lower St. Croix National Scenic Riverway and riverway valley is one of the most scenic areas in the region. This region requires careful wireless communication service facility siting and design to minimize adverse visual effects. This proposal does not minimize adverse visual effects.

7. The record will indicate the various concerns that the public and agencies had with this application. The various concerns are found in the public testimony and the exhibits brought forth by the public and governmental agencies.

In finding number 4, the board agreed with several observations in the zoning staff report.

## OPINION

### I. *INTRODUCTION*

Congress enacted the Telecommunications Act "to provide for a pro competitive, de-regulatory national policy framework designed to accelerate rapidly private-sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition...." H.R.Conf.Rep. No. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124. The act represents a balance between this need for a uniform federal policy and the interests of state and local governments in continuing to regulate certain aspects of the wireless communication industry, the siting of facilities, in particular. *Aegerter v. City of Delafield,* 174 F.3d 886, 887 (7th Cir.1999); *Town of Amherst, N.H. v. Omnipoint Communications Enterprises, Inc.,* 173 F.3d 9, 13 (1st Cir. 1999). This compromise is reflected in subsection 332(c)(7), which provides:

(7) Preservation of local authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modifica-

tion of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

47 U.S.C. § 332.

As noted in the express language of the Telecommunications Act, local zoning laws govern the siting of wireless facilities. *See Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999) ("[T]he TCA does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.' ") (citation omitted). Such local zoning decisions, however, are subject to judicial oversight to insure that the local government has acted within the act's statutory limitations. *See id.* at 493.

## II. *EFFECT OF BOARD'S DECISION ON THE PROVISION OF PERSONAL WIRELESS SERVICES*

■ Plaintiff contends that the board's denial of its special exception permit application constitutes an effective ban on personal wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). The clearest violation of this subsection occurs when a local government imposes a blanket prohibition or an outright ban on personal wireless services. *See AT & T Wireless PCS,*

*Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 428 (4th Cir.1998) (collecting cases). An *effective* ban may be found if a local government indicates that repeated individual applications will be denied because of a generalized hostility to wireless services. *360 Degrees Communications Co. v. Albemarle County*, 211 F.3d 79, 86 (4th Cir.2000). However, without more, an individual denial of an application to build a wireless service facility will not constitute an effective ban. *See APT Pittsburgh Limited Partnership v. Penn Township*, 196 F.3d 469, 478 (3d Cir.1999) (collecting cases). *See also Aegerter*, 174 F.3d at 891 (§ 332(c)(7)(B)(i)(II) precludes *de facto* bans on personal wireless services altogether, but does not mean that "every municipality must have towers wherever anyone wants to put them").

■ Although circuit courts have formulated slightly different variations of what additional proof a provider must bring to demonstrate that a governmental entity has effectively prohibited wireless service by denying a single request to construct a telecommunications tower at a particular location, all agree that the availability of other, less intrusive feasible alternatives to close a gap in the provider's service to its customers will defeat a § 332(c)(7)(B)(i)(II) claim. *See Penn Township*, 196 F.3d at 480 (denial will not constitute effective prohibition unless site chosen by provider is "least intrusive means to close a significant gap in service"); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 639 (2d Cir.1999) (same); *360˜Communications*, 211 F.3d at 87–88 (rejecting precise formulation of what "more" provider needs to show in order to establish effective ban but indicating that feasible less intrusive alternatives will defeat claim); *Town of Amherst, N.H.*, 173 F.3d at 14 (provider must provide evidence demonstrating that "further reasonable efforts [to secure a permit to build

a wireless facility] are so likely to be fruitless that it is a waste of time to even try"). Further, these courts agree that the burden is on the provider to develop a record showing that it made a "full" or "good faith" effort to identify and evaluate less intrusive alternatives and that the alternatives are not feasible to serve its customers. *See Southwestern Bell Mobile Systems, Inc. v. Todd,* 244 F.3d 51, 63 (1st Cir.2001); *Penn Township,* 196 F.3d at 480; *Town of Amherst,* 173 F.3d at 14. (The Seventh Circuit has not yet considered a claim brought pursuant to § 332(c)(7)(B)(i)(II). In *Aegerter,* 174 F.3d at 891, the provider conceded that it would be able to continue providing service with its existing tower, making it unnecessary for the court to decide "how broad the duty is on any given municipal entity to ensure that wireless services remain available.")

■ Although this case presents a close question, I conclude that plaintiff has not met its heavy burden of showing that its proposal to build a 185–foot tower on the Haase property is the only feasible plan for closing the gap in its coverage along Highways 95 and 35 and the St. Croix River. Having carefully reviewed the record, I find that although plaintiff's proposed tower may offer the least intrusive alternative if only a single tower is utilized, plaintiff has not presented evidence adequate to show that it developed and studied thoroughly the possibility of utilizing multiple, shorter towers to achieve the coverage it seeks. In particular, the Pinnacle report and comments made by plaintiff at the hearings indicate that a system using several, somewhat lower towers would be technically feasible if the towers could be located in "forbidden" zones such as the Riverway District, along the highway or in the City of Marine on St. Croix. Plaintiff has taken the position that these zones cannot be considered as part of the reasonable alternatives analysis because of set-back requirements or local ordinances prohibiting towers in these areas. However, by plaintiff's own admission, there is at least a theoretical possibility that plaintiff could obtain variances from the relevant zoning authorities. (In fact, on at least one occasion plaintiff has applied for a variance from a local ordinance prohibiting towers except in specified areas. *See Penn Township,* 196 F.3d at 472.) Although plaintiff asserted at the hearings that such variances would be difficult to get approved if not impossible, it has not presented any evidence to support this conclusory assertion. For example, plaintiff has not pointed to any evidence showing that the relevant land use authorities governing the so-called "forbidden" zones have rejected previous similar applications for a variance or that plaintiff would not be able to satisfy the requirements for obtaining a variance. *Compare Town of Amherst,* 173 F.3d at 15 (provider argued that its ability to meet stringent local requirements for variance or special exception permit had no "real prospect of success"). The fact that the showing of hardship that is required for a variance under state law is a difficult standard to meet is not sufficient by itself to establish that such an option was not feasible. *See id.,* at 15–16 (although not frivolous for provider to assert claim that it would not be able to satisfy local criteria for variance or special exception permit for telecommunications system, provider failed to show inevitability of rejection of alternative proposals).

Furthermore, the record contains evidence indicating that constructing one or more towers in the riverway was more than just a theoretical possibility. The National Park Service stated that it was willing to allow towers on its land if doing so would reduce the overall visual impact on the region. Plaintiff argues that this willingness to consider allowing towers in the riverway is irrelevant because the land

is located within St. Croix County's Riverway Zoning District, where new towers are prohibited under the county's tower ordinance. In response, the board asserts that any decision by the park service to allow towers in the riverway would override St. Croix County's ban on such towers. However, the board has not provided any specific legal authority to support this assertion, relying instead on the general proposition that local zoning regulations are preempted by federal law. Although this assertion may be true in some circumstances, it is not true here. The Wild and Scenic Rivers Act contains numerous provisions suggesting cooperative regulation with state and local government. *See, e.g.,* 16 U.S.C. §§ 1273(a), 1275(b), 1276(b) and 1281(e). The Master Plan for the riverway calls for local governments to "develop zoning controls along the St. Croix that are consistent with the purposes of the Wild and Scenic Rivers Act" and contains recommended zoning provisions for state and local governments. *See Kiernat v. County of Chisago,* 564 F.Supp. 1089, 1091 (D.Minn.1983). In 1973, the Wisconsin Legislature enacted Wis.Stat. § 30.27, which required the Department of Natural Resources to adopt guidelines and specific standards for local zoning ordinances that apply to "the banks, bluffs and bluff tops of the Lower St. Croix River" and directed local governments lying within the riverway's boundaries to adopt zoning ordinances complying with the guidelines and standards within 30 days after their effective date. Wis.Stat. § 30.27. According to the rules ultimately promulgated by the Department of Natural Resources, "[l]ocal regulations adopted pursuant to s. 30.27, Stats., may be more, but not less, restrictive" than the standards established by the Department, but "[i]n no case shall a use or activity allowed by [the Department's] rules be permitted contrary to local zoning regulations." Wis.Admin.Code NR 118.02(3). The import of these regulations is that, contrary to the board's dismissal of its tower ban as merely inert legislation, St. Croix County shares responsibility with the National Park Service for managing the riverway and is not precluded from enforcing its own zoning regulations to the extent they are consistent with or more restrictive than those imposed by the park service. *See also Kiernat,* 564 F.Supp. at 1094 (finding no intention by Congress to preempt state and local zoning through enactment of Wild and Scenic Rivers Act). Indeed, the fact that St. Croix County has enacted its own zoning laws that apply to the land bordering the river is the most compelling evidence of this shared regulatory authority. (Unfortunately, neither party has supplemented the record with the Master Plan or any other evidence specifying the relative responsibilities or jurisdictions of the various land use authorities with respect to the riverway.)

That said, plaintiff has not presented any evidence to show that the National Park Service does *not* have the authority to override the county's zoning laws; plaintiff asserts merely that the service could do so only to advance a federal purpose. Yet plaintiff does not contend that no federal purpose could be found in allowing plaintiff to construct a communications tower on federal land if it was determined that it was the best way to protect the scenic integrity of the Lower St. Croix National Scenic Riverway. Furthermore, although the board's rather non-committal response to plaintiff's concerns about the county's ban on towers in the riverway does not instill confidence in the board's commitment to allowing towers in the Riverway District, nonetheless the board's position suggests that it would defer to any decision by the National Park Service to allow plaintiff to construct one or more communications towers on its land. The possibility that alternative sites could be developed on park service land within the

Riverway District was one of the reasons cited by the board for rejecting plaintiff's application. There is nothing in the record to suggest that the board would be hostile to a proposal by plaintiff for the construction of one or more towers on this land should such a plan prove to be feasible. The record indicates that plaintiff did not pursue this alternative seriously because of its view that the National Park Service was opposed to any application within the vicinity of the riverway. However, plaintiff's view is refuted by the comments of the National Park Service representatives at the hearings to the effect that they were willing to work with plaintiff to develop potential alternative tower locations within the riverway. Although the technical feasibility of one or more towers on park service land may well prove to be fantasy, plaintiff's failure to investigate this option adequately defeats its claim that the board's decision constitutes an effective ban.

Also, plaintiff did not evaluate seriously the possibility of providing the necessary coverage by utilizing existing structures within the Riverway District as allowed by the county's ordinance. Plaintiff says that it did, stating that it evaluated the sites proposed by Nelson and determined that they were not feasible. However, it is difficult to conclude that plaintiff made a good faith effort to evaluate alternatives when it failed to conduct any independent investigation but limited its evaluation to only those sites proposed by Nelson. Plaintiff, not the board, bore the burden of evaluating whether there were other available alternatives. See Todd, 244 F.3d at 63 ("We see nothing in the TCA that would support placing a burden upon the Board to present evidence that there were other sites available to Southwestern Bell with a lesser minimal visual impact.") The board asked plaintiff specifically to evaluate multiple, alternative sites and present it with demonstrative evidence showing why they

were or were not feasible, but plaintiff did not do so. Even with respect to the sites proposed by Nelson, plaintiff did not develop any maps or mock-ups or provide the specific information regarding coordinates, ground elevation and height assumptions that Nelson requested. Plaintiff simply presented a memo from its engineer stating that the sites would not work because the existing structures were not tall enough. This falls short of the showing plaintiff must make in order to demonstrate that the board's decision amounted to an effective ban on personal wireless communication. See id. (provider could not succeed on effective ban claim where only alternative sites it considered had been suggested by board).

In sum, plaintiff concedes that a system using several, somewhat lower towers is at least technically feasible if the towers could be located in "forbidden" zones such as the Riverway District. Rather than developing evidence to present to the board regarding the feasibility of such alternative sites, plaintiff appears to have taken the position that it would be more efficient and less costly to stick with its single-tower proposal because of the difficulties likely to be associated with obtaining the necessary leases and variances that would be required to build facilities in the Riverway District. Plaintiff's approach was understandable, given the costs involved in conducting feasibility studies, procuring leases and pursuing variance requests. However, as the court stated in Town of Amherst, "[t]his one-proposal strategy may have been a sound business gamble, but it does not prove that the town has in effect banned personal wireless communication." Id., 173 F.3d at 15. Plaintiff has failed to carry its burden to develop and present evidence showing that it made a good faith effort to determine whether shorter towers at alternate sites would be feasible to provide the necessary

service. It was not enough for plaintiff simply to respond to the suggestions made by the county's expert as to alternative sites without conducting its own analysis of the feasibility of additional, multiple locations, including locations in the Riverway District. Furthermore, on this record, plaintiff has not shown that the board would inevitably reject an alternative proposal with lower towers or that plaintiff would not be able to satisfy the criteria necessary to obtain a variance from the ordinance prohibiting towers in the Riverway District, should the ordinance come into play. Perhaps, in the final analysis, plaintiff's proposal to build a single tower on the Haase site will prove to be more palatable to the board than a system requiring multiple towers in the riverway, but plaintiff has not yet provided enough information to allow the board to make that decision. Accordingly, because plaintiff has not provided an adequate demonstration of the absence of other, less intrusive alternatives that would be feasible to close its coverage gap, it has failed to prove its effective prohibition claim.

## III. *SUBSTANTIAL EVIDENCE*

Plaintiff contends that the board's decision to deny the special exemption permit was not supported by substantial evidence. The Telecommunications Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). In *Aegerter,* 174 F.3d at 889, the court held that when the drafters of the Telecommunications Act used the term "substantial evidence" as the standard of review to be used by courts in reviewing decisions of city councils and local zoning authorities, they were referring to the "normal" substantial evidence standard applied by courts when

reviewing agency decisions. Under this deferential standard of review, the court reviews the entire record to see whether it contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Dilling Mechanical Contractors, Inc. v. NLRB,* 107 F.3d 521, 524 (7th Cir.1997)). In determining whether the evidence before an agency was substantial, a court views the record in its entirety and takes account of evidence unfavorable to the agency's decision. *See American Textile Mfr. Inst., Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). It "may neither engage in [its] own fact-finding nor supplant the [board's] reasonable determinations." *Town of Oyster Bay,* 166 F.3d at 494; *see also Aegerter,* 174 F.3d at 892 (stating that Telecommunications Act does not allow courts to "second guess" political decisions of local governments regarding placement of cell sites).

■ Although the parties agree that this is the proper standard of review, they disagree whether plaintiff or defendant bears the burden of establishing that the determination of the board was supported by substantial evidence. As plaintiff acknowledges, this court has concluded that the burden of proof rests with the party seeking to overturn the decision, reasoning that such traditional allocation is consistent with the deferential standard afforded to agency decisions and with the Seventh Circuit's approval of the "conventional substantial evidence standard" in *Aegerter,* 174 F.3d at 890. *APT Minneapolis, Inc. v. Eau Claire County,* 80 F.Supp.2d 1014, 1022 (W.D.Wis.1999). Aside from stating that the "majority of courts" have determined that the local zoning authority bears the burden of establishing that its decision was supported by substantial evidence, plaintiff has not presented any arguments

that persuade me to reconsider my initial position. I note that although this is still an open question in the Seventh Circuit, at least one circuit court shares the view that the traditional allocation of the burden of proof to the party challenging the decision applies to decisions under the Telecommunications Act. *See Southwestern Bell Mobile Systems, Inc. v. Todd,* 244 F.3d 51, 63 (1st Cir.2001). Moreover, this view is consistent with Wisconsin law, which places the burden on the applicant to prove that its proposed use of the land accords with the zoning plan. *See Kapischke v. County of Walworth,* 226 Wis.2d 320, 329, 595 N.W.2d 42, 47 (Ct.App.1999).

■ To obtain a special exception permit to build its tower, plaintiff had to prove that its proposed use did not violate the spirit or general intent of the zoning ordinance and was not "contrary to the public health, safety or general welfare ... or substantially adverse to property values in the neighborhood affected." In denying plaintiff's application, the board found that it was inconsistent with the spirit and intent of the zoning ordinance. The board found that plaintiff had not done enough to investigate alternative sites or multiple alternative sites that might lessen the visual impact on the Lower St. Croix National Scenic Riverway, noting that the riverway and its valley was "one of the most scenic areas in the region."

Plaintiff contends that the board's stated concerns about the tower's aesthetics and its visual impact on the area are insufficient bases to support its decision. I do not understand plaintiff to be contending that a local zoning board may never take aesthetic considerations into account when denying a permit application, for it is well-settled that such concerns may be sufficient to support the denial of a tower application. *See Todd,* 244 F.3d at 61 ("In assessing the visual impact of the proposed tower, the Board was entitled to make an aesthetic judgment about whether that impact was minimal, without justifying that judgment by reference to an economic or other quantifiable impact"); *Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township,* 181 F.3d 403, 408 (3d Cir.1999) ("'[Aesthetic] considerations are sufficient to support the denial of a special exception under Pennsylvania law and are consistent with Congress' intent to allow localities to accommodate traditional zoning considerations in siting wireless telephone transmitters"); *Aegerter,* 174 F.3d at 891 ("Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and we note that aesthetic harmony is a prominent goal underlying almost every such code."). However, courts have rejected aesthetics-based denials of tower applications where the record reflects only "vague and generalized" concerns about aesthetics that are not supported by specific facts in the record, *see, e.g., Town of Oyster Bay,* 166 F.3d at 495–96 (finding that "[v]ery few residents expressed aesthetic concerns at the hearings, and those who did express them did not articulate specifically how the proposed cell sites would have an adverse aesthetic impact on the community"); *Pine Grove Township,* 181 F.3d at 408–09 (residents' comments addressed tower's visibility only briefly and focused more on alleged health effects); *APT Minneapolis, Inc. v. City of Maplewood,* 1998 WL 634224, at *4, n. 1 (Minn Aug. 12, 1998) ("Other than vague assertions by neighbors and council members, there is no evidence to support the conclusion that the proposed tower would be aesthetically displeasing"). Plaintiff contends that the evidence before the board regarding aesthetics fits within this line of cases. Citing a different line of cases, the board contends that the evidence before it was sufficiently specific to

support its decision to deny plaintiff's permit application for aesthetic reasons.

Although the parties' desire to rely on the facts of other cases to support their position is understandable, such comparisons are of limited usefulness because each case has unique facts. Furthermore, because siting decisions are governed by the various and varied laws of the states, counties, and municipalities in question, federal case law interpreting the contours of the Telecommunications Act is necessarily inconsistent. In the end, the underlying question is simply whether there is substantial evidence in *this* record to support the board's decision.

Having carefully reviewed the evidence considered by the board, the various cases cited by the parties and the parties' arguments, I conclude that substantial evidence in the record supports the board's conclusion that the design and location of plaintiff's tower as proposed would have an adverse visual impact on the Lower St. Croix River and surrounding area. Although some of the comments from the public consisted of general statements that the tower was an eyesore and would have a negative impact on property values, most of the concerns about aesthetics were focused on the incompatibility of a 185–foot tower on the river bluff extending noticeably above the tree line with the extraordinary scenery of the National Scenic Riverway and with the historic district in the City of Marine on St. Croix. In particular, the National Park Service voiced strong opposition to the tower, asserting that the unspoiled view of the St. Croix River Valley was a unique natural resource that deserved unusual protection. The park service supported its position with maps developed during the crane testing that showed that a tower on the Haase site would be visible from locations up to four miles away on the St. Croix River and Minnesota Highway 95 and from the Ma-

rine on St. Croix Historic District. The tower's visibility from various sites in the City of Marine on St. Croix was confirmed by photographs submitted to the board by local residents.

Contrary to plaintiff's assertion, the National Park Service was not the only party that opposed the tower on grounds that it was incompatible with the character and scenery of the St. Croix Riverway. As noted in the facts, the City of Marine on St. Croix, the St. Croix River Association, the Minnesota–Wisconsin Boundary Area Commission and several members of the public expressed the view that the riverway was a unique scenic resource that would be harmed by plaintiff's proposed tower. Several of these groups and individuals expressed a preference for a multiple-tower approach utilizing towers that were more consistent in height and appearance with existing features in the landscape. This view was supported by zoning board staff, who concluded that the St. Croix Riverway and nearby historic preservation areas such as Marine on St. Croix possessed extraordinary scenic qualities that demanded special consideration for proposed wireless telecommunication service facilities.

As support for its contention that these concerns are insufficient to support the board's decision, plaintiff argues that, in contrast to other cases that have been upheld on aesthetic grounds, plaintiff's proposed tower is not in a residential neighborhood, historic district or town center and is not near a school. It also notes that its proposed monopole tower would be low enough to avoid the FAA's requirements for any lighting or special coloration and therefore would be as visually unobtrusive as possible. Furthermore, argues plaintiff, despite the comments from the residents of Marine on St. Croix regarding the effect of the tower on the city's historic

setting, the Minnesota and Wisconsin State Historic Preservation Offices found that the tower would have no adverse effect on historic properties, including the Marine on St. Croix Historic District. Finally, it points out that approval for the tower came from the individuals living closest to the proposed tower, the residents of Somerset. Yet "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). As noted previously, determining whether a local zoning board's reliance on aesthetic concerns is supported by substantial evidence is a fact-based inquiry. The record contains sufficient, specific evidence about aesthetics to support the board's conclusion. The testimony by the various agencies and individuals in this case were not "generalized" concerns about the aesthetics of *any* tower, but were specific to the proposed design and location chosen by plaintiff for *this* tower. Plaintiff does not deny that the proposed tower would extend significantly above the tree line along the riverway and would not be compatible with the natural surroundings, thus making it visible to users of the riverway and surrounding communities. In making a decision affecting the Lower St. Croix Riverway, which has been granted federal protection because it possesses "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values," the board was entitled, if not required, to take these unique properties of the region into account.

Moreover, under Wisconsin law, the board was entitled to consider even "generalized" lay testimony regarding the aesthetic impact of the tower on the surrounding landscape. *Kapischke*, 226 Wis.2d at 330, 595 N.W.2d at 47 & n. 5

("The Kapischkes complain that these were merely 'generalized concerns' by certain members of the public. But aesthetic concerns are, by their very nature, highly subjective and will often be expressed in 'generalized' terms."). This is one factor that distinguishes the instant case from *APT Minneapolis, Inc. v. Stillwater Township*, 2001 WL 1640069 (D.Minn. June 22, 2001), a case involving a similar proposal to build a similar tower on the Minnesota side of the St. Croix River. In that case, which plaintiff urges this court to follow, the court found that resident opposition to the tower consisted of "generalized" concerns that did not provide legitimate basis for denying plaintiff's application. *Id.*, 2001 WL 1640069, at *12. (Despite this finding, the court did not describe in any detail the comments made by local residents.) In reaching this conclusion, the court found it "significant that Minnesota courts have held that resident opposition due to aesthetic and property devaluation concerns is an insufficient basis for a local government authority's denial of a special-use permit." *Id.*, at n. 20. In contrast, local zoning boards in Wisconsin may consider lay testimony regarding generalized effects, including aesthetics, when deciding whether an application for a special exception permit avoids harm to the "public health, safety and welfare." *See Kraemer & Sons, Inc. v. Sauk County Bd. of Adjustment*, 183 Wis.2d 1, 11, 515 N.W.2d 256, 260 (1994). This distinguishing factor renders the decision in *Stillwater Township*, 2001 WL 1640069 at *13, inapposite. (In addition, in *Stillwater Township*, the court found suspicious the township's rationale for denying plaintiff's application because of questionable circumstances surrounding the township's imposition of a moratorium on wireless communications towers while plaintiff's application was pending. No such factor is present in this case.)

Furthermore, the board did not deny plaintiff's permit application merely because the tower would have an adverse visual effect on the landscape; it found also that plaintiff had not given an adequate response to the board's request for additional information regarding alternative systems that might be less conspicuous, such as multiple sites using shorter antennas. As the permit applicant, plaintiff bore the duty of providing the board with evidence demonstrating that a denial would violate the Telecommunications Act or the St. Croix County tower ordinance. *See Kapischke*, 226 Wis.2d at 332, 595 N.W.2d at 48. Substantial evidence supports the board's conclusion that plaintiff did not satisfy its burden. As noted previously, plaintiff did not support its claim that no feasible alternatives existed with any mock-ups, maps, or alternative configurations that would demonstrate that it had actually tested, rather than simply "ruled-out," various options. In other words, plaintiff did not "show its work." Furthermore, although plaintiff argues that it complied with the board's request by evaluating the silos and other sites proposed by Nelson, the board could reasonably conclude that plaintiff's failure to undertake to eliminate any potential alternative sites other than those suggested by the county's expert was an unsatisfactory response to its request. Likewise, the board could reasonably reject plaintiff's assertion that it had eliminated all feasible alternatives in light of evidence indicating that plaintiff had not pursued any meaningful discussions with the National Park Service despite that agency's representations that it was open to the possibility of allowing towers on its land in the riverway.

Plaintiff also contends that the county's ordinance prohibited the board from requiring evidence regarding several smaller towers in lieu of one large tower because one of the ordinance's stated purposes is to "maximize the use of existing and approved towers ... to reduce the number of towers needed to serve the community." Ord. § 17.80(5). Plaintiff argues that its proposed tower satisfied this goal because it would allow for co-location with other providers; in addition, plaintiff points out that the county's tower consultant found that plaintiff's proposed tower was consistent with the ordinance's goal of reducing the number of towers. Plaintiff's argument is unpersuasive. First, it is not clear that § 17.80(5) applies to plaintiff's proposed tower because the tower was neither "existing" nor "approved." Second, nothing in the ordinance required the board to approve a single tower allowing co-location if it concluded that such a design did not minimize adverse visual effects. As the board points out, the overall goal of the ordinance is to provide for wireless service in St. Croix County with the least adverse visual effect. In denying plaintiff's permit application, the board relied on the portion of the ordinance stating that one of its purposes was to "minimize adverse visual effects of wireless communication facilities through careful siting and design standards." Ord. § 17.80(3). To be sure, plaintiff presented evidence indicating that it had designed its proposed tower to be as inconspicuous as possible and that it was the least intrusive single-tower site available. Nonetheless, the board could properly conclude that multiple, shorter towers would have a less adverse visual effect than the single tower proposed by plaintiff. Local zoning boards are entrusted with the discretion to make zoning decisions. Courts presume such decisions to be valid and correct. *See Snyder v. Waukesha County Zoning Bd. of Adjustment*, 74 Wis.2d 468, 476, 247 N.W.2d 98, 103 (1976). *See also 360˜Communications*, 211 F.3d at 85 (choosing between two reasonable positions is decision "of the type that zoning boards are typically qualified to resolve").

In sum, reasonable minds could conclude that the board had adequate evidence before it to support its decision to deny plaintiff's application for a special exception permit: the adverse visual impact that plaintiff's proposed tower would have on the extraordinary scenery and character of the Lower St. Croix National Scenic Riverway and surrounding areas, along with plaintiff's failure to persuade the board that there were no feasible, less conspicuous system designs that would allow it to close its coverage gap. Accordingly, plaintiff's motion for summary judgment on its claim that defendants violated 47 U.S.C. § 332(c)(7)(B)(iii) must be denied.

## IV. CONCLUSION

Although I have concluded that there is insufficient evidence in the existing record to support plaintiff's claims that the board violated the Telecommunications Act, the board should not interpret this decision as granting it license to sit back and deny successive applications by plaintiff on the ground that "there must be other options" without "giving any clue of what will do the trick." *Town of Amherst,* 173 F.3d at 17. On this record, there is nothing to suggest that the board is sending plaintiff down dead end roads in order to delay the inevitable or in the hopes that plaintiff will just give up and go somewhere else; to the contrary, the record indicates that the board is aware that it may not effectively preclude personal wireless service. It would behoove the board to work actively with plaintiff and other interested agencies such as the National Park Service to find ways to allow the siting of towers in a way that preserves the scenic integrity of the riverway while allowing plaintiff to meet its coverage goals. Undue passivity on the part of the board is likely to work against it should future litigation arise between these parties.

With the conclusion that defendants did not violate the Telecommunications Act,

plaintiff's request for an award of attorney fees and damages under 42 U.S.C. §§ 1983 and 1988 becomes moot.

## ORDER

IT IS ORDERED that the motion of plaintiff Voicestream Minneapolis, Inc. for summary judgment is DENIED and its motion for an award of attorney fees and damages is DENIED as moot. The motion of defendants St. Croix County and St. Croix County Board of Adjustment for summary judgment is GRANTED. Defendants' objection to the O'Rourke affidavit is DENIED as unnecessary. The clerk of court is directed to enter judgment in favor of defendants and close this case.